STATE OF CONNECTICUT *v.* ULISES
RIVERA COLLAZO
(AC 28294)

Lavine, Robinson and Lavery, Js.

Argued October 23, 2008—officially released April 14, 2009

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *David R. Shannon*, assistant state's attorney, for the appellee (state).

LAVINE, J. The defendant, Ulises Rivera Collazo, appeals from the judgment of conviction, rendered after a jury trial, of possession of a sawed-off shotgun in violation of General Statutes § 53a-211 and criminal possession of a firearm in violation of General Statutes § 53a-217. The defendant also appeals from the judgment of the trial court revoking his probation pursuant to General Statutes § 53a-32. On appeal, the defendant claims that (1) the court improperly (a) failed to order an evaluation of his competency to stand trial and to conduct an independent inquiry as to the need for such an evaluation and (b) failed to give a requested jury instruction on nonexclusive possession, and (2) he was denied a fair trial due to prejudicial prosecutorial impropriety. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. For a number of years before the incident that gave rise to the defendant's appeal, Monica Rojas and her husband, Hector Rojas, were acquainted with the defendant. At some time prior to November, 2005, the defendant allegedly developed a romantic interest in Monica Rojas. Hector Rojas approached the defendant and told him to stay away from Monica Rojas. At some later time, the defendant saw Hector Rojas, driving the family automobile with his wife and children and screamed at him. In September or October, 2005, Monica Rojas interacted with the defendant in Mambo's Cafe in Danbury and slapped him. On the night of November 19, 2005, and the early morning of November 20, 2005, Monica Rojas and the defendant were both at Club Crystal, also in Danbury. He stared at her, but the two did not speak. Monica Rojas noticed that the defendant had left Club Crystal between 12:30 a.m. and 1 a.m. The club is an approximately five minute drive from the Rojas home.

At approximately 1:12 a.m. on November 20, 2005, Hector Rojas was in the Rojas' apartment at 21 Fairfield Ridge in Danbury when a gunshot was fired through the front door. Hector Rojas called the Danbury police department. Officers Jose Agosto, Thadeus Zalenski and Sergeant Vincent Lajoie came to the apartment within five minutes and interviewed Hector Rojas. Lajoie observed a bullet hole in the front door of the apartment and damage to the wall, window frame, blinds and a kitchen cabinet.

Zalenski interviewed a neighbor, Julia Wallace, who had arrived home in a taxicab when she observed an older white car with its lights off parked in the middle of the road facing 23 Fairfield Ridge. Wallace saw the car back up and move onto the front yard of a neighboring house and then drive away. Wallace and the taxicab driver, Jack Coates, heard a loud pop. Wallace described the vehicle as an older white Ford Tempo.

Agosto overheard Hector Rojas speaking in Spanish on his cellular telephone and questioned him. In response, Hector Rojas told the police that a person named Ulises might be responsible for the shooting. Lajoie knew the defendant by the name of Ulises and drove to the location where he had last seen the defendant, an apartment at 69 Rose Street, some two miles away. Lajoie arrived at 69 Rose Street in Danbury at approximately 2:10 a.m. and saw a white Ford Taurus with one person sitting behind the steering wheel.[1] It was cold, and Lajoie could see exhaust coming from the vehicle.

Lajoie parked thirty feet behind the vehicle and relayed information about the vehicle to police dispatch. Lajoie learned that the registration for the vehicle had been cancelled, and no one had reported the vehicle

[1] At trial, Lajoie and Officer Gary Bardelli testified that a Ford Tempo and Taurus have a similar appearance.

stolen. Lajoie observed no signs that the vehicle had been broken into. When the occupant of the vehicle exited it, Lajoie recognized the defendant and ordered him to move to the rear of the vehicle and to put his hands on it. The defendant did not comply immediately but walked about putting his hands in the air and placed a water bottle on top of the vehicle. Lajoie drew his service weapon. The defendant responded by removing his leather coat and placing it on the ground. Ultimately he complied with Lajoie's order.

Agosto and Officer Gary Bardelli arrived at the scene. When Bardelli approached the passenger's side of the vehicle, he saw a sawed-off shotgun and called out, "gun." The officers arrested the defendant and searched the vehicle and the defendant's person and personal property. The officers found a pump action Remington twelve gauge, sawed-off shotgun and a spent casing in the vehicle and four shotgun shells in the defendant's pocket. Lajoie noticed that the serial number on the shotgun had been scratched off. The officers advised the defendant of his rights pursuant to *Miranda*.[2] The defendant told the officers that he knew he was going to jail and that he did not want to cooperate with them.

The defendant was charged with two counts of risk of injury to a child, criminal possession of a firearm, alteration of a serial number of a firearm and criminal possession of a sawed-off shotgun. The jury found the defendant guilty of criminal possession of a firearm and criminal possession of a sawed-off shotgun and not guilty of alteration of a firearm identification number in violation of General Statutes § 29-36. The court declared a mistrial as to both charges of risk of injury to a child. Following sentencing, the defendant appealed.[3]

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The court, *Schuman, J.*, found the defendant guilty of violation of probation under a separate information. The defendant received a total effective sentence of sixteen years in prison.

I

The defendant's first claim is that the court, *Marano*, *J.*, denied him due process of law by improperly denying counsel's request for a competency evaluation, pursuant to General Statutes § 54-56d,[4] and by failing to conduct an independent inquiry to determine the need for such an evaluation. We do not agree.

The transcript of the defendant's April 13, 2006 court appearance reveals the following. On that date, the defendant was represented by attorney Robert Field for what appears to have been a status conference. Field described for the court the discovery efforts that he and the prosecutor had undertaken to examine the evidence and stated that laboratory testing was to be conducted with respect to fingerprints. Field also informed the court that the defendant was unhappy.

When the court invited the defendant to speak, the defendant represented that he had been in court on March 30, 2006, and informed the court that he did not want Field to represent him and that he wanted to represent himself.[5] The defendant also represented that he and Field had argued.

The defendant also addressed the court about the denial of his request for a speedy trial. The court informed the defendant that Field had filed a notice of intent to file a motion for a speedy trial, but until the defendant had been incarcerated for eight months, he was not entitled to a speedy trial. The defendant told

---

[4] General Statutes § 54-56d provides in relevant part: "(a) . . . A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense. . . . (c) . . . If, at any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency. . . ."

[5] We were not provided with a copy of the March 30, 2006 transcript.

the court that he had demanded that Field show him a law book explaining the speedy trial rule. Field referred the defendant to General Statutes § 54-82m. Field explained to the court that in his opinion, it made no sense to demand a speedy trial at that time because discovery, including laboratory testing, had not been completed. The defendant then demanded that the court give him a speedy trial that day. The court again explained to the defendant that he was not entitled to a speedy trial. The defendant informed the court of an alleged prior instance in which he had been involved and was granted a speedy trial. He also asked the court to sign a paper to the effect that he was required to be incarcerated for eight months before he was eligible for a speedy trial. The court denied the defendant's request. The defendant accepted the court's decision and asked that his case be continued until he had been incarcerated for eight months and that he then be brought to trial. The defendant concluded by telling the court that he did not want Field to represent him.

Field stated: "I'd ask the court to consider a [§] 54-56d exam. I don't make that request lightly. I discussed [with the prosecutor that] I would ask for this. The reason . . . I am doing it is because . . . I have been doing this practice now for thirty years. I have never seen somebody so contentious. He does not listen to me. I mean, I can go there, and I can try to tell him what I have seen or what I have done. He just does not listen. His response is to yell at me, to tell me that I do not know what I am talking about, that I do not know what I am doing and he wants to represent himself. . . . [He] has indicated previously that he is filing a slander suit against me. The basis for the slander suit was that I communicated the state's [plea] offer to him. To me, this indicates somebody who might have a problem. I do not know if he does. I tried to ask him if he

has had psychiatric treatment in the past. He will not answer my questions. . . .

"It is extremely difficult for me. . . . [I]f I thought that somebody else would be able to come in here and satisfy his desires and that he [would] cooperate with someone else, I would ask that the court grant a motion to have me removed and let somebody else come in here. . . . I would be interested in seeing if he may have bipolar or some kind of intermittent explosive disorder or some kind of problem which is making it hard for him to process information that I am trying to give him."

The defendant responded that the bottom line was that he did not want Field to represent him. The defendant related to the court a conversation he allegedly had with Field about fingerprints. Field replied, "he sounds delusional to me . . . because this conversation never occurred . . . ."

The court stated: "Number one, sir, based on your request for a motion for speedy trial and what Mr. Field is indicating about a slander suit, it is quite clear to me, sir, that you are not familiar with the law, and it would be detrimental to you to represent yourself. That is number one.

"Mr. Field, with regard to . . . your motion for a [competency evaluation], based on what you have represented so far, sir, I do not believe that the examination is justified. While it is true that [the defendant] is bent on representing himself and vindicating himself, it sounds like he wants . . . a trial immediately. He feels . . . based on what he said in the courtroom, that the state has no case against him. I do not find that I have heard anything, sir, that justifies the request at this point. If you are willing . . . to appoint a special public defender . . . sir, then we will appoint a special public defender."

The court adjourned and requested that counsel meet in chambers. When the court reconvened, it canvassed the defendant with respect to his request to represent himself. At the conclusion of its lengthy canvass, the court asked the defendant if he wanted to proceed to trial and to represent himself. The defendant responded: "Your Honor, I'm going to put it like this: I just don't want Mr. Field to represent me; that's it, period. Because if . . . I asked [on] the thirtieth of March if I could get another lawyer, and you denied it. . . . Now, if you can assist me with a public defender besides Mr. Field, I would take one."

## A

We first address the applicable standard of review. In its brief, the state has argued that our review should be conducted pursuant to the abuse of discretion standard. The defendant contends, however, that the court committed reversible error by failing to conduct an independent inquiry to create a record for plenary review. We agree with the state that the abuse of discretion standard applies.

"[Section] 54-56d provides that a defendant shall not be tried, convicted or sentenced while incompetent and permits a competency hearing to be held whenever it appears that the defendant is unable to understand the proceedings against him or to assist in his own defense. As a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute *substantial evidence* of mental impairment. . . . The trial court should carefully weigh the need for a hearing in each case, but this is not to say that a hearing should be available on demand. *The decision whether to grant a hearing requires the exercise of sound judicial discretion.*" (Citations omitted; emphasis added; internal quotation

marks omitted.) *State* v. *DesLaurier*, 230 Conn. 572, 585–86, 646 A.2d 108 (1994). We therefore review the defendant's claim pursuant to the abuse of discretion standard.

B

The defendant claims that the court improperly denied his motion for a competency hearing. We conclude that the court did not abuse its discretion by denying the request for a § 54-56d hearing.

"[A] defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense. General Statutes . . . § 54-56d (a). This statutory definition mirrors the federal competency standard enunciated in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). According to *Dusky*, the test for competency must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 20–21, 751 A.2d 298 (2000); see also *Drope* v. *Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975).

"Although § 54-56d (b) presumes the competency of defendants, when a reasonable doubt concerning the defendant's competency is raised, the trial court must order a competency examination. . . . Thus, [a]s a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the

form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, supra, 253 Conn. 21.

"Section 54-56d establishes the procedural requirements for competency determinations. A court may undertake a competency examination upon a motion by the defendant or the state and in some circumstances must evaluate the defendant's competency sua sponte. . . . If the court finds that the request for an examination is *justified* and that . . . there is probable cause to believe that the defendant has committed the crime for which he is charged, the court *shall order* an examination of the defendant as to his competency. . . . [A] trial court must order a competency hearing at any time that facts arise to raise a reasonable doubt about the defendant's competency to continue with the trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 22–23. If the court denies a defendant's motion for a competency evaluation when there is reasonable doubt regarding the defendant's competency, the reviewing court must determine whether the trial court deprived the defendant of substantive due process. Id., 25.

"A defendant who appeals on the basis of a trial court's failure to conduct an evidentiary inquiry into his competence must make a showing that the court had before it specific factual allegations that, if true, would constitute substantial evidence of mental impairment. *Sanders* v. *United States*, 373 U.S. 1, 21, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963)." *State* v. *George B.*, 258 Conn. 779, 786, 785 A.2d 573 (2001). A defendant does not raise a reasonable doubt as to his competency if he "(1) did not suffer from any known or apparent

mental illness or defect that would impair the defendant's ability to understand the criminal proceedings or to assist in his own defense; (2) possessed minimum communication skills such as the ability to read and write; (3) understood the basic charges against him and his rights to accept or reject a plea bargain; and (4) understood the consequences of accepting or rejecting a plea bargain." *State* v. *DesLaurier*, supra, 230 Conn. 587; see also *State* v. *George B.*, supra, 788. Moreover, unsubstantiated references to psychiatric treatment and medicine fail to trigger a competency evaluation. *State* v. *DesLaurier*, supra, 588.

Conversely, a court abuses its discretion in not granting a motion for a competency examination when there is "psychiatric, medical or historical testimony relevant to the defendant's competency to stand trial . . . a sufficient pattern of behavior that would raise, in and of itself, a reasonable doubt about his competency. See *Drope* v. *Missouri*, [supra, 420 U.S. 178–79] (trial court required to give proper weight to defendant's recent attempt at suicide and spouse's testimony about defendant's history of disturbed mental state); *Pate* v. *Robinson*, [383 U.S. 375, 385–86, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)] (trial court's decision not to grant competency hearing on its own motion improperly ignored testimony of defendant's history of 'pronounced irrational behavior'); *United States* v. *Auen*, 846 F.2d 872, 878 [2d Cir.] (consistent exhibition of 'bizarre' behavior prior to and during trial requires further competency hearing) [on appeal after remand, 864 F.2d 4 (2d Cir. 1988)] . . . ." (Citation omitted.) *State* v. *DesLaurier*, supra, 230 Conn. 587–88.

In the case before us, the court, which had an opportunity to observe the defendant on numerous occasions,[6] denied Field's motion for a competency hearing,

---

[6] Our review of the record, including all of the transcripts of proceedings that occurred prior to the date in question that were provided to us, reveals that the defendant appeared before Judge Marano on November 21 and 29,

finding that what Field had represented with respect to the defendant did not justify an examination pursuant to § 54-56d. The court also found that the defendant was not familiar with the law, that his representing himself would be detrimental to him but that he wanted to vindicate himself because he believed the state had no case against him. Although the opinion of defense counsel is a factor to be considered when considering a § 54-56d motion, the court need not accept counsel's opinion without question. *Drope* v. *Missouri*, supra, 420 U.S. 177 n.13. As in *DesLaurier*, the court could have assigned little weight to Field's "bare opinion, without any further detail about the date, duration, frequency or actual behavior involved in the conduct . . . ."[7] *State* v. *DesLaurier*, supra, 230 Conn. 588. A defendant must demonstrate that his past mental infirmities, if any, presently affect his competency. *United States* v. *Burns*, 811 F. Sup. 408, 416 (E.D. Wis. 1993), aff'd, 37 F.3d 276 (7th Cir. 1994), cert. denied, 515 U.S. 1149, 115 S. Ct. 2592, 132 L. Ed. 2d 840 (1995).

It appears to us that this case provides an example of a breakdown of the attorney-client relationship. Both the defendant and Field told the court that they engaged in shouting matches. The defendant stated that he

2005, and January 9 and 12, 2006. Judge Marano was entitled to rely on his own observations of the defendant's responses during the canvassing, in light of the defendant's demeanor, tone, attitude and other expressive characteristics. The trial court was in the best position to assess whether the defendant behaved rationally at that time. See *State* v. *Silva*, 65 Conn. App. 234, 250, 783 A.2d 7, cert. denied, 258 Conn. 929, 783 A.2d 1031 (2001).

[7] "Compare *United States* v. *Goines*, 988 F.2d 750, 782 (7th Cir.), [cert. denied sub nom. *Daniels* v. *United States*, 510 U.S. 887], 114 S. Ct. 241, 126 L. Ed. 2d 195 (1993) (no abuse of discretion in denying competency hearing where trial court personally observed defendant to be lucid and defense counsel failed to support allegations about defendant's competency with sufficient facts), with *United States* v. *Nichols*, 661 F. Sup. 507, 513 (W.D. Mich. 1987) (granting competency hearing based on defense counsel's 'four-page, detailed affidavit' outlining prior instances of 'bizarre' behavior and psychiatric problems)." *State* v. *DesLaurier*, supra, 230 Conn. 588–89.

wanted to represent himself because he explicitly did not want Field to represent him. Moreover, the defendant's ability to respond appropriately to the court and to think reasonably and lucidly was borne out during the court's canvass of him with respect to his desire to represent himself at trial.

"The United States Supreme Court in *Godinez* v. *Moran*, 509 U.S. 389, 399, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993), established that, for federal constitutional purposes, the standard of competency required to stand trial is the same as the degree of competency required to plead guilty or to waive the right to counsel. [Our Supreme Court] also has recognized that the competency standards for standing trial and other parts of a criminal proceeding are equivalent. *State* v. *Day*, 233 Conn. 813, 825, 661 A.2d 539 (1995) . . . ." *State* v. *Johnson*, supra, 253 Conn. 26.

Following the colloquy concerning Field's request for a competency evaluation, the court recessed briefly and met with counsel. When the court returned to the bench, it canvassed the defendant with respect to his request to represent himself. On the basis of our review of the court's thorough canvass of the defendant with respect to his right to counsel, we conclude that there was nothing in the colloquy between the court and the defendant that would cause the court to question his competency to stand trial. The transcript makes clear that the defendant understood the charges against him and the seriousness of the proceedings. More importantly, the defendant stated that the bottom line was his desire not to be represented by Field but that if the court was willing to assist him with a special public defender, he would accept that representation. As in *Johnson*, the court's canvass of the defendant with respect to his right to waive counsel occurred immediately after Field had raised the issue of competency. Although the defendant ultimately and wisely decided against representing

himself, the canvass gave the court further opportunity to observe the defendant's ability to consult with new counsel with a reasonable degree of rational and factual understanding of the proceedings against him. We therefore conclude that the court did not abuse its discretion by denying the defendant's motion for a competency evaluation.[8]

## II

The defendant claims that the court, *Schuman, J.*, improperly failed to give a requested instruction regarding nonexclusive possession with respect to the crimes of possession of a sawed-off shotgun; see General Statutes § 53a-211;[9] and criminal possession of a firearm; see General Statutes § 53a-217;[10] and denied him due process. We disagree.

The defendant relies on the following evidence presented at trial to support his claim. At the time Lajoie came upon the white Taurus in front of the defendant's residence, the defendant alone was sitting in the operator's seat with the motor running. The key was in the ignition. Lajoie learned from police dispatch that the vehicle's registration and license plates had been cancelled. Lajoie saw no signs of forced entry and received no reports that the vehicle had been stolen. When

[8] Although the defendant claims in his brief that he has been harmed by Judge Marano's decision to deny Field's request for a competency evaluation, he has failed to demonstrate that he was unable to comprehend the proceedings or to assist in his defense or that he was in fact incompetent. During the course of our review of the other issues in the defendant's appeal, we observed that substitute counsel filed no motions for a competency evaluation pursuant to General Statutes § 54-56d. The court, *Schuman, J.*, before whom the case was tried, also did not voice concerns about the defendant's competency.

[9] General Statutes § 53a-211 (a) provides in relevant part: "A person is guilty of possession of a sawed-off shotgun . . . when he owns, controls or possesses any sawed-off shotgun that has a barrel of less than eighteen inches or overall length of less than twenty-six inches . . . ."

[10] General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . when such person possesses a firearm . . . and (1) has been convicted of a felony . . . ."

Bardelli approached the passenger's side of the vehicle, he could see a sawed-off shotgun.

During trial, the defendant submitted a request to charge on nonexclusive possession with respect to the charge of criminal possession of a firearm.[11] Specifically, the defendant requested that the court charge that "mere presence in the vicinity of the firearm, however, is not enough to establish possession." During closing argument, the state argued that the defendant was in physical possession of the sawed-off shotgun because it was found under the seat of a motor vehicle that he had been operating. In response, the defendant argued that there was no evidence that he owned a motor vehicle, and the state had failed to place the key to the vehicle in evidence. He argues further that the jury thereby could infer that the motor had never been running and that he had never been in control or possession of the vehicle. The court declined to give the defendant's requested instruction on nonexclusive possession.

---

[11] In his brief, the defendant claims that it was improper for the court to fail to give the nonexclusive possession instruction as to the charges of criminal possession of a firearm and possession of a sawed-off shotgun. In his request with respect to criminal possession of a firearm, however, the defendant omitted the nonexclusive possession language that he included in his request regarding possession of a sawed-off shotgun. The defendant failed to object to the jury instruction given by the court.

To the extent that he did not preserve his appellate claim of an improper jury instruction regarding criminal possession of a firearm, the defendant requests that we review his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant acknowledges that an instruction requested by a defendant may not be challenged on appeal under *Golding* if it was induced error. See *State* v. *Fabricatore*, 281 Conn. 469, 476–83, 915 A.2d 872 (2007). The defendant "nonetheless requests a ruling on this subissue, for the sake of future review . . . ." The defendant's brief claims no knowledge of the reason for the disparate requests to charge. Although the claim is not reviewable under *Golding*, our conclusion that the court did not improperly charge the jury on the element of possession ipso facto pertains to its instruction on criminal possession of a firearm and possession of a sawed-off shotgun. Possession under either statute means the same thing.

The court instructed the jury with respect to criminal possession of a firearm and possession of a sawed-off shotgun, in part, as follows: "[T]he defendant is charged with possession of a sawed-off shotgun in violation of § 53a-211 . . . [i]n that on or about November 20, 2005, in the vicinity of 69 Rose Street . . . the defendant possessed a sawed-off shotgun with a barrel of less than eighteen inches. . . . For you to find the defendant guilty of the crime of possession of a sawed-off shotgun, the state must prove the following three elements beyond a reasonable doubt: one, that the defendant had in his possession a sawed-off shotgun . . . .

"The first element requires the state to prove beyond a reasonable doubt that the defendant had in his possession a sawed-off shotgun. Possession means to have physical possession or otherwise to exercise dominion or control or ownership over the sawed-off shotgun. As so defined, it means either actual physical possession such as having the sawed-off shotgun in one's hand, home or other place under one's exclusive control or constructive possession, which may exist without personal present dominion over the sawed-off shotgun, but with the intent and ability to retain such control and dominion."

As to criminal possession of a firearm, the court instructed that "the state charges that the defendant committed the offense of criminal possession of a firearm in violation of . . . § 53a-217 . . . [i]n that on or about November 20, 2005, at or around 2:10 a.m. in the vicinity of 69 Rose Street . . . the defendant, a convicted felon, did unlawfully possess a firearm. . . . For you to find the defendant guilty of this charge, the state must prove the following three elements beyond a reasonable doubt: one, that the defendant possessed a firearm. . . . I have previously defined the concepts of possession and firearm, which are part of the first element, and you should use those definitions here."

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995). When the challenge to a jury instruction is of constitutional magnitude, the standard of review is "whether it is reasonably possible that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Morales*, 71 Conn. App. 790, 820, 804 A.2d 902, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002).

"As a general rule, a defendant is entitled to have instructions on a defense for which there is evidence produced at trial to justify the instruction, no matter how weak or incredible the claim." (Internal quotation marks omitted.) *State* v. *Williams*, 258 Conn. 1, 8, 778 A.2d 186 (2001). "When we are reviewing a trial court's failure to charge as requested, we must adopt the version of the facts most favorable to the defendant which the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Nesmith*, 220 Conn. 628, 632, 600 A.2d 780 (1991). Although a requested jury instruction may be accurate as an abstract principle of law, it must be applicable to the facts of the case at hand. Id., 633.

"Where the defendant is not in exclusive possession of the premises where the [illegal item is] found, it

may not be inferred that [the defendant] knew of the presence of the [illegal item] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . The doctrine of nonexclusive possession was designed to prevent a jury from inferring a defendant's possession of [an illegal item] solely from the defendant's nonexclusive possession of the premises where the [illegal item] was found." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, supra, 258 Conn. 7–8.

In this case, the defendant argues that he was entitled to an instruction on nonexclusive possession because there was no evidence that he was the owner of the Ford Taurus in which the sawed-off shotgun was found. Although there was no evidence of who owned the Ford Taurus, there was overwhelming evidence that the defendant was the only person in the vehicle with the motor running at the time he was arrested and that the shotgun was in plain sight of an officer peering into the vehicle. Moreover, shotgun shells were found in the defendant's pocket. The defendant only has speculated and has not brought to our attention any evidence that would suggest that someone else had been in the vehicle immediately prior to Lajoie's parking behind the vehicle or who in fact owned the vehicle. We therefore cannot conclude that there was any evidence that would have warranted a jury instruction on nonexclusive possession.

Our review of the entire jury charge reveals that the elements of the crimes of possession of a sawed-off shotgun and criminal possession of a firearm were laid before the jury. The charge outlined the elements of the statutes, including possession. We therefore conclude that it is not reasonably possible that the jury was misled by the court's instruction and that the defendant was not denied due process of law.

## III

The defendant's third claim is that the prosecutor committed prejudicial improprieties during his closing argument. We disagree.

"Prosecutorial [impropriety] claims invoke a two step analysis. First, the reviewing court must determine whether the challenged conduct did, in fact, constitute [an impropriety]. Second, if [an impropriety] occurred, the reviewing court must then determine if the defendant has demonstrated substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process.

"Because the claimed prosecutorial [impropriety] occurred during closing arguments, we advance the following legal principles. [P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Skidd*, 104 Conn. App. 46, 64–65, 932 A.2d 416 (2007).

An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, 204 Conn. 523, 540,

529 A.2d 653 (1987). Those factors include "the extent to which the [impropriety] was invited by defense counsel's conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id.

In this case, the defendant claims that the prosecutor violated his right to a fair trial during final argument by asking the jury to "[t]hink about how that would affect your mental health if that bullet came through your front door while you were home, and think about if you were a thirteen or fourteen year old kid and the police show up in the middle of the night"; and during rebuttal argument, by attacking defense counsel by stating, "who is finessing whom?"[12] and explaining his trial strategy and asking the jury to infer that a person who has a sawed-off shotgun for concealment knows something about gunshot residue. During trial, defense counsel objected to many of the prosecutor's statements he now challenges, and, as appropriate, the court either sustained the objection, offered an alternative or gave a curative instruction.

With respect to the prosecutor's having invited the jury to "[t]hink about how that would affect your mental health . . . and . . . if you were a thirteen or fourteen

---

[12] Although the defendant raises this claim in his brief, he concedes that the prosecutor's remarks about finesse were in direct response to defense counsel's argument and that our case law consistently has held that invited argument is not improper. "A prosecutor may respond to the argument of defense counsel during rebuttal." *State* v. *Galarza*, 97 Conn. App. 444, 471, 906 A.2d 685, cert. denied, 280 Conn. 936, 909 A.2d 962 (2006). The defendant asks, however, that we reconsider the appropriate manner in which to respond to an improper argument. We decline the defendant's invitation, as we are bound by the holdings of our Supreme Court. See, e.g., *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986) (party that initiates discussion opens door to rebuttal).

year old kid and the police show up," defense counsel objected, and the court instructed the prosecutor to take another course, which the prosecutor did. Even if we were to conclude that the prosecutor's initial argument was improper, the defendant has failed to demonstrate how he was harmed by it. The prosecutor's statement was made only once, it was central only to the charges of risk of injury to a child, and the court took curative measures.[13] Most significantly, the jury found the defendant not guilty of the charges for which such an argument was central, risk of injury to a child.

The defendant also claims that the prosecutor improperly discussed the state's trial strategy. During rebuttal, the prosecutor explained to the jury why the state did not call Coates as a witness. Again, this argument was invited by the argument of defense counsel, who questioned why the state did not call Coates as a witness. Following final arguments, the defendant filed a motion for a mistrial on the basis of prosecutorial improprieties, giving the trial strategy argument as a basis for the motion. The court pointed out that it was defense counsel's argument that was improper because he had not given the state fair notice of his intention to comment on a missing witness.[14] The court ruled that "given that [defense counsel raised a question about a missing witness], why isn't it a fair response for the state that didn't have proper notice to indicate a reason why it did not call this witness?" Moreover, the court gave the jury the following instruction during its charge: "Arguments and statements by lawyers, the lawyers

---

[13] After defense counsel objected, the court aptly stated: "I'm not sure you can place the jurors in the position of the victims. You might refer to their common experience or other people. I'm not sure you can place the jurors in a position of victims." The prosecutor then stated: "Based on your experience with children . . . you have kids . . . children of your own, your nieces or nephews, how do you think that would affect a child?"

[14] See State v. Malave, 250 Conn. 722, 740, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000).

are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence. . . . If the facts, as you remember them, differ from the way the lawyers have stated them, your memory of them controls." We conclude in light of this instruction, which the jury is presumed to have followed, that there was no prosecutorial impropriety that was prejudicial to the defendant in this regard.

The defendant also claims that the prosecutor improperly introduced evidence that was not presented at trial by arguing that a person in possession of a sawed-off shotgun whose serial number has been marred might know something about gunshot residue. The defendant objected, but the court overruled the objection, noting that the argument was fair comment on the evidence. Again, we conclude that there was no prosecutorial impropriety. Argument is proper if the jury reasonably could draw such conclusions on the basis of the evidence presented at trial. See *State* v. *Felix*, 111 Conn. App. 801, 807, 961 A.2d 458 (2008). Argument is improper if the prosecutor draws conclusions for which there is no evidentiary support. Id. For all of the foregoing reasons, we conclude that there was no prosecutorial impropriety, in isolation or combination, that deprived the defendant of a fair trial.

The judgments are affirmed.

In this opinion the other judges concurred.