STATE OF CONNECTICUT *v.* JOSE PAULINO
(AC 30935)

Beach, Bear and Borden, Js.

Argued October 28, 2010—officially released March 1, 2011

*Steven B. Rasile,* special public defender, for the appellant (defendant).

*Nancy L. Walker,* special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, and *Robert Diaz,* assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Jose Paulino, appeals from the judgment of conviction, rendered after a trial to the court, of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) and possession of narcotics with intent to sell within 1500 feet of a public school in violation of General Statutes § 21a-278a (b). On appeal, the defendant claims that the trial court abused its discretion by failing, sua sponte, during the trial, to order a competency hearing. We disagree and, accordingly, affirm the judgment of the trial court.

The trial court found the following facts. On February 12, 2008, Officer Frank Bellizzi of the New Britain police department, assigned to a federal Drug Enforcement Administration task force (task force) along with officers from several other local police departments, participated in the arrest of Sheveran Hardy. Hardy, who was in possession of 100 grams of heroin at the time of his

arrest, agreed to cooperate with the police by ordering more drugs from his supplier. Without being provided a script by Bellizzi or anyone else associated with the task force, Hardy made a series of telephone calls to his supplier while a task force member listened to and simultaneously recorded the calls. The individual with whom Hardy spoke was a male who identified himself as "Papi" and spoke English with a heavy Spanish accent. During the conversation, Hardy and "Papi" planned a drug transaction, using language of the drug trade and referring to items by their quantity. "Papi" agreed to meet with Hardy at his home shortly after midnight when "Papi" returned to Hartford from New York. The purpose of their meeting was for "Papi" to deliver 500 grams of heroin to Hardy. Hardy told the officers that "Papi" drove a green Ford Explorer.

Shortly after midnight on February 13, 2008, task force members on surveillance near Hardy's home on Allendale Road in Hartford witnessed a green Ford Explorer (vehicle) matching the description of Papi's vehicle travel from Zion Street onto Allendale Road. When the vehicle stopped, the task force members executed a containment maneuver and approached the vehicle. The officers removed the sole occupant from the vehicle, later identified as the defendant. On the front seat of the vehicle was a large shopping bag containing five separately wrapped 100 gram blocks of a substance that later was identified as heroin. Also on the front seat was a mobile telephone that was associated with the telephone number Hardy had been calling earlier in the evening. The defendant had no drug paraphernalia on his person or in the vehicle. Hardy identified "Papi" as the defendant and said that he was his source of supply. The defendant later admitted that the voices on the audio recordings of the telephone calls were himself and Hardy.

The events that occurred in the trial court also are relevant to our resolution of this appeal. The defendant was a fifty-two year-old resident of the Dominican Republic who, throughout the proceedings, spoke through a Spanish language interpreter. The defendant stated that he had visited the United States periodically for twenty-eight years and eventually married a woman who lived in Hartford. The defendant had no prior criminal record.

Throughout the pretrial proceedings, the defendant maintained his innocence and rejected offers to plead guilty. On October 6, 2008, the defendant waived his right to a jury trial and elected to be tried by the court. During the canvass, the court inquired of the defendant whether he understood why the court would be asking questions regarding his election of a trial by the court. The defendant responded: "Maybe to clear up the case?" The court explained that the canvass would clear up his decision for a trial by the court. The court then apprised the defendant of his right to a trial by jury and advised him that a trial by jury was one of his "most important constitutional rights" and that, by electing a trial by the court, he would be giving up this right. The defendant responded: "I believe in the experience of the judge." The court and the defendant then engaged in the following colloquy:

"The Court: . . . As long as you make the decision with your eyes wide open and understanding the important right that you are giving up. Okay? Has anyone forced you to make this decision, sir?

"The Defendant: No.

"The Court: Has anyone said—made any promise to you to get you to make this decision?

"The Defendant: No, no.

"The Court: Would it be fair to say that this is the decision you're making because you think it's in your best interest to have a trial before a judge instead of a jury?

"The Defendant: God told me so.

"The Court: Okay. And the only other question that I would have is, do you understand that if—if I accept your waiver—if I accept your decision, that that decision will be final? And that we will—final in the sense that we will proceed to a trial before me and not have a jury at all, and you will not have an opportunity to change your mind over the next couple of days.

"The Defendant: I'm learning this.

"The Court: What percentage of what I'm telling you in English do you understand?

"The Defendant: Fifty percent.

"The Court: All right. Well, good, make sure that you listen to 100 percent of what the interpreter says so that you have it all the way.

"Because there are times when I see you react to my words and I say, well, he understands most of this. But what I don't want to do is, I don't want to—I want to be sure that despite the fact that you have a pleasant smile, that you understand that this is very serious business. But I want you to understand that this is very serious business, and I don't do this for my health but for yours.

"The Defendant: I believe that I am innocent.

"The Court: Well, that's good and that's perfectly fine. But the issue is, here, how you get tried on the question of guilt or innocence itself.

"The Defendant: I believe that I'm innocent.

"The Court: And that's of course, not responsive to my question. The question I have is, do you wish to be tried by a judge alone? Are you satisfied that that's the right decision for you to make that gives you the best opportunity to defend yourself properly?

"The Defendant: Yes, yes. I believe in that."

The court then explained the range of possible penalties the defendant could face were he to be found guilty and asked the defendant if he understood those penalties. The defendant responded: "Well, I said I don't understand but—" whereupon the court interrupted and again explained the potential penalties in a different manner. The defendant then responded: "I believe in you, forget it."

Following the canvass, the court inquired whether the attorneys had any questions or concerns. The court and defense counsel first discussed a separate issue, after which defense counsel stated that he had no further questions about the court's canvass. The court then stated: "[It] would appear to me that [the defendant] is capable of making this decision. He has been advised of his rights, I will accept his waiver . . . ."

On October 30, 2008, after the state rested its case, defense counsel made the following statement:

"[Defense Counsel]: We are going to proceed with the case, and the case is going to consist of my client testifying. But I want the court to know, and it's a little bit awkward and perhaps if this were a jury trial I would see the court in chambers.

"I have never, during the pendency of this case, filed a motion for competency of my client, and I am not doing so at this time. But I want to make the court aware of some things.

"My client would like to testify to things that I have advised him not to. In fact, I've advised him not to take the witness stand. He insists on doing so and telling a story that I don't feel comfortable asking questions about.

"And I know that the procedure, if it were a jury trial, would be for the court to permit perhaps a narrative from the defendant and perhaps I could start asking questions. But I think he just, as he put it, wants to talk to the court. And I explained to him that's not the procedure we use. We're bound by the rules of evidence [and] there would be questions and answers.

"He has items in a manila envelope that he says proves his innocence. He chooses not to share those with me. So, keeping in mind, having done this for thirty years, I know there is a vast difference between the ability to cooperate with counsel and the desire to. I haven't seen anything in my representation of him since February that shows me he doesn't understand the proceedings or that he doesn't have the ability to cooperate."

Upon taking the witness stand, the defendant first indicated that he was not feeling well and wanted "some pills" because he had an argument with his lawyer and his heart was "beating very fast."[1] The court then

---

[1] The colloquy was as follows:

"The Defendant: I feel sick and I need some pills, and I had a very tough argument with [my lawyer] and I'm not feeling well.

"The Court: What kind of pills?

"The Defendant: Something for the nerves—something for the heart because it's beating very fast.

\* \* \*

"The Court: You understand that the job of your lawyer is to give you advice? Is that true?

"The Defendant: I don't feel well.

"The Court: I'm not asking you that right this second.

"The Defendant: I've been fighting with my lawyer for eight months, and he's not defending me."

explained the advantages and disadvantages of testifying, and emphasized the importance of the decision. The defendant confirmed his wish to testify in narrative form. The court explained to the defendant that the state had a right to cross-examine him, and the defendant affirmed that he understood.

The defendant's testimony was that he did not knowingly possess heroin. Rather, the defendant claimed that Hardy offered him $700 to bring an envelope to some individuals in New York, who then unexpectedly gave him two bags to bring back as gifts to Hardy. The defendant repeatedly maintained his innocence, insisting that he was the victim of a conspiracy between Hardy and the police. The defendant explained that he did not suspect that Hardy would involve him in a drug transaction because Hardy "knows that I don't deal drugs. . . . He told me to take the envelope, and I took the envelope. They sent a gift to him with me, and I sent it to him and that was all." To support these assertions, the defendant stated that Hardy was aware that the defendant had withdrawn $15,000 from his bank account and was keeping the money in his home. The defendant offered into evidence a portion of an investigation report prepared by the task force, which indicated that Hardy had seen large amounts of cash in the defendant's bedroom closet. The defendant stated: "The case begins where [Hardy] says that I have a lot of money in my house. That's where the trap begins and the falseness of the case—that's where the falseness of this case begins." The defendant asserted that his arrest was an attempt by Hardy and the police to steal his money, stating that "they weren't interested in looking for drugs because there were no drugs; they were interested in getting my money. That's what they were interested in. They made a mention . . . because they thought I had a lot of money." The defendant also asserted that the audio

recordings of his conversation with Hardy were edited to make innocuous conversations seem incriminating.[2]

The defendant insisted that he never had dealt narcotics. He expressed his desire to "contact the whole world" about the police conspiracy so that the corrupt officers could be removed from the police force.[3] Over the course of the trial, he expressed open dissatisfaction with his defense counsel. At one point, the defendant declared that defense counsel was asking him "stupid questions," and he repeatedly claimed that defense counsel was not representing him properly. "I would tell [defense counsel] for instance, this is salmon colored, and he'd say it's white or it's black. He always says the contrary." The defendant occasionally appeared confused and frustrated by court procedures. When the defendant stated that he did not understand some of the procedures because he was in court for the first time in his life, the court responded: "I'm confident that you understand enough. Answer [the state's] questions." The defendant also repeatedly referred to Hardy and other drug sellers as "delinquents," insisting

---

[2] During trial, the following colloquy occurred when defense counsel questioned the defendant:

"Q. Okay. Now, during the trial last week, one day the testimony—excluding what we heard this morning from the chemist, you heard in court eight different CD recordings of two voices; do you remember that?

"A. Yes.

"Q. All right. And was one of them yours?

"A. Yes.

"Q. And was the other one Mr. Hardy?

"A. Let it be known that—that recording was not complete."

[3] In his testimony, the defendant stated: "Here, I'm telling, in front of everyone, that they're delinquents, they should be investigated. They should be kicked out. All these policemen should be investigated from the inside because testifying here they said—being the law of this country—they put a delinquent on the phone to ask the questions over the phone with a formula, and the intelligence of this country should work the way it should work." Later, he stated: "I just want everyone's cooperation that we clean this country and we clean—and we clean it of corruption and the same in my country. I want it to be clean."

that the task force and other government agencies should not be investigating him but should be investigating the "delinquents," the real sellers of drugs.

At the conclusion of cross-examination, defense counsel conducted a redirect of the defendant, who expressed a concern for his safety and requested court protection. The defendant stated: "The favor that I'm asking—I made a strong testimony yesterday. I fear for my life. I could fear for my life because there are very dangerous people out there. I fear for my family, I fear for myself. I need protection wherever I am. I need you to do me that favor no matter where I am. If I have to go on, I'll go on. I don't care about names, I don't care about anything. If I have to defend this nation, I'll give names, and I don't care who falls. I'm sorry for whoever—detectives, whoever."

The court found the defendant guilty of possession of narcotics with intent to sell by a person who is not drug-dependent and possession of narcotics with intent to sell within in 1500 feet of a public school, as the evidence showed that Hardy's home on Allendale Road is within 1500 feet of the real property of Moylan School, a public elementary school in Hartford. At sentencing, the defendant again insisted that he was innocent and that he had been convicted unjustly. The court stated that it was confident in its determination and noted that the defendant has "been respectful to me and to the court . . . and you have, frankly, behaved appropriately throughout." The defendant was sentenced to consecutive three year terms on each charge, for a total effective sentence of six years imprisonment. This appeal followed.

The defendant raises one claim on appeal, namely, that the trial court violated his due process right to a fair trial when it failed to order, sua sponte, a competency examination after observing his behavior at trial. The

defendant did not raise this issue at trial and, accordingly, seeks to prevail on this unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

Under the *Golding* doctrine, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. "The first two prongs of *Golding* address the reviewability of the claim, and the last two involve the merits of the claim." *State* v. *Brown*, 56 Conn. App. 26, 31, 741 A.2d 321 (1999), cert. denied, 252 Conn. 927, 746 A.2d 790 (2000).

The state concedes that the defendant has met the first two *Golding* requirements in that the record is adequate to permit review and the defendant's claim is of constitutional magnitude. We therefore proceed to a consideration of the third prong, namely, whether the alleged constitutional violation exists that deprived the defendant of a fair trial. See *State* v. *Wolff*, 237 Conn. 633, 662, 678 A.2d 1369 (1996). We conclude that the defendant's claim does not meet the third prong of *Golding*.

At the outset, we set forth the relevant standard of review and legal principles that guide our resolution of the issue. We review the court's determination of competency under an abuse of discretion standard. See *State* v. *DesLaurier*, 230 Conn. 572, 586, 646 A.2d 108 (1994). "In determining whether the trial court [has]

abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Hernandez*, 254 Conn. 659, 665–66, 759 A.2d 79 (2000).

"The conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. . . . This rule imposes a constitutional obligation, [on the trial court], to undertake an independent judicial inquiry, in appropriate circumstances, into a defendant's competency to stand trial . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 205 Conn. 673, 686, 535 A.2d 345 (1987). General Statutes § 54-56d (a) codified this constitutional mandate, providing in relevant part: "A defendant shall not be tried, convicted or sentenced while the defendant is not competent. . . . [A] defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense."

"This statutory definition mirrors the federal competency standard enunciated in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). According to *Dusky*, the test for competency must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him. . . . Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." (Citations

omitted; internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 20–21, 751 A.2d 298 (2000). "Thus, in appropriate circumstances, a trial court must, sua sponte, make a further inquiry into a defendant's competence to ensure that he is competent to plead guilty." *State* v. *Silva*, 65 Conn. App. 234, 248, 783 A.2d 7, cert. denied, 258 Conn. 929, 783 A.2d 1031 (2001). A court is required to conduct such an inquiry "whenever [the court becomes aware of] substantial evidence of mental impairment." (Internal quotation marks omitted.) *State* v. *Connor*, 292 Conn. 483, 523, 973 A.2d 627 (2009). "Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . ." (Internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 272, 849 A.2d 648 (2004).

Nonetheless, § 54-56d (b) presumes that a defendant is competent, and "[t]he standard governing the determination of competency to stand trial is a relatively low one and . . . mental illness or reduced mental capacity does not alone provide a basis for concluding that a defendant is not competent to stand trial." *State* v. *Connor*, supra, 292 Conn. 524. "An accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense . . . ." (Citation omitted.) *State* v. *DeAngelis*, 200 Conn. 224, 230, 511 A.2d 310 (1986).

In this case, the defendant claims that the court, sua sponte, should have ordered a competency evaluation. We are unaware, however, of evidence that was before the court that would have indicated that the defendant suffered from *any* known or apparent mental disease or defect, much less one that would have impacted his

ability to understand the charges against him and assist in his defense. In fact, the record reveals that the defendant fully participated in his decisions not to plead guilty, to waive a jury trial and to elect to testify in his own defense. He responded pertinently with respect to the court's questions regarding his decisions to waive a jury trial and to testify on his own behalf.

Furthermore, the court had ample opportunity to witness the defendant's behavior and demeanor firsthand. The court canvassed the defendant twice—first regarding his decision to waive a jury trial and again regarding his decision to testify on his own behalf. While the defendant was being canvassed regarding his waiver of a jury trial, the court noted that he reacted to and seemed to understand much of the English spoken by the court. When the court inquired, the defendant stated that he understood about 50 percent of the court's English. During the defendant's testimony, when he stated that he did not understand court procedures because he was in court for the "first time in fifty-two years," the court responded: "I'm confident that you understand enough. Answer [the state's] questions." At sentencing, the court noted that the defendant had "behaved appropriately throughout" the trial. The court, having been in the best position to assess the defendant's competence, offered no indication that it thought that the defendant was incompetent to stand trial.

We note that the trial judge "is in a particularly advantageous position to observe a defendant's conduct during a trial and has a unique opportunity to assess a defendant's competency. A trial court's opinion, therefore, of the competency of a defendant is highly significant." (Internal quotation marks omitted.) *State* v. *Connor*, supra, 292 Conn. 523–24. As such, "the trial court was entitled to rely on its own observations of the defendant's responses during the canvassing, in light of his demeanor, tone, attitude and other expressive

characteristics. . . . The trial court was in the best position to assess whether the defendant behaved rationally at that time." (Citations omitted.) *State* v. *Des-Laurier*, supra, 230 Conn. 590.

Also, a trial court is entitled to consider trial counsel's assertions that his client is competent. See *State* v. *Monk*, 88 Conn. App. 543, 550, 869 A.2d 1281 (2005) ("[t]he fact that the defendant's counsel did not request a competency hearing is an indicator of the defendant's competency to plead guilty"). In the present case, defense counsel expressly stated that he was not seeking a competency evaluation of the defendant, and noted that "I haven't seen anything in my representation of him since February that shows me he doesn't understand the proceedings or that he doesn't have the ability to cooperate."

Although the defendant offers examples of behavior that he argues constituted substantial evidence of mental impairment, we see nothing in the record that would lead us to conclude that the court, sua sponte, should have ordered a competency evaluation. Specifically, the defendant notes that (1) he admitted, on several occasions, that he was confused about the proceedings and acknowledged that he still was learning about certain court procedures; (2) he often gave unresponsive answers to questions; (3) he responded, "God told me so," when asked by the court why he was electing a court trial rather than a jury trial; (4) he said the police officers who investigated him were thieves who were attempting to steal his money; (5) he stated that he feared for his safety following his testimony regarding the officers; (6) he insisted that the audio recordings of his telephone conversations with Hardy were incomplete; (7) he expressed a desire to "contact the whole world" about his case; (8) he suggested that the allegedly corrupt police officers be arrested; and (9) he demonstrated open hostility toward defense counsel, going

so far as not to share certain documents with him and to disregard his advice not to testify.

First, although the defendant did admit that he often was confused by court procedures, a lack of legal expertise is not indicative of incompetence. See *State* v. *Johnson*, supra, 253 Conn. 28 n.27. The defendant had no prior criminal record and had never been in court before. Therefore, it is to be expected that he occasionally would be confused and require the court or his counsel to explain and to clarify certain issues and procedures. Furthermore, the record demonstrates that the defendant was lucid and that he understood his rights as well as the charges against him.

We also do not conclude that the defendant's response of "God told me so" during a canvass by the court demonstrates incompetence. The defendant did assert, during the canvass, other rationales for his choice to waive a jury trial such as his discussions with defense counsel and the defendant's belief in the experience of the judge. Additionally, although the record indicates that the defendant spoke of God on two occasions, there is no evidence that his references were because of any disabling mental health issues.[4] See, e.g., *State* v. *Kendall*, 123 Conn. App. 625, 653, 2 A.3d 990 (trial court did not abuse discretion in determining that defendant's belief that divine intervention would occur at trial to produce evidence of innocence did not create reasonable doubt as to defendant's competency), cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

With respect to the defendant's allegations of doctored evidence, police corruption, and a conspiracy against him, these must be viewed in the context of his

---

[4] The second occasion on which the defendant referenced God was at the conclusion of closing arguments when he stated: "Have a nice day and whatever God wills it to be."

defense. The defendant advanced the theory that he did not knowingly transport heroin but had been tricked into doing so by Hardy and the police, whose motive was to steal the large sum of money he was keeping in his house. The defendant's assertion that the recordings were altered was offered to explain the highly incriminating nature of the conversations. His defense, although ultimately unpersuasive, is not facially illogical. Rather, the defendant demonstrated an ability to assert a cogent defense that, if believed, would have exonerated him. The fact that the defendant's testimony was unconvincing is not evidence of incompetence.

The defendant's assertion that he could be in danger after implicating police officers in criminal activity and his expressed desire to "contact the whole world" about the "real drug dealers" were also not evidence of incompetence within the context of his defense. Similarly, in *State* v. *Williams*, 65 Conn. App. 59, 82, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001), the defendant asserted that there was a police conspiracy against him. Despite a finding by a psychiatrist associated with a New Haven court clinic that the defendant was incompetent to stand trial, this court affirmed the trial court's determination that the defendant was competent, as well as its refusal to grant additional evaluations of the defendant's competency. Id., 87. This court stated that "[t]he record lacks any credible evidence that could raise a reasonable doubt about the defendant's competency throughout the course of the proceedings"; id., 86; and that the defendant's attempt to place the blame on law enforcement "may well have been his way of coping with the dire situation confronting him." Id., 87.

Furthermore, a defendant's dissatisfaction with defense counsel does not indicate incompetence. See *State* v. *Collazo*, 113 Conn. App. 651, 663–65, 967 A.2d 597 (trial court did not abuse discretion by denying

defendant's motion for competency evaluation, despite fact that defendant and defense counsel engaged in "shouting matches" and defendant said he did not want defense counsel to represent him), cert. denied, 293 Conn. 904, 976 A.2d 705 (2009); State v. Williams, supra, 65 Conn. App. 86 (defendant's refusal to raise defense of insanity, as recommended by counsel, not indication of incompetency but rather disagreement over trial strategy).

Finally, the defendant cites a case from the United States Court of Appeals for the Second Circuit, United States v. Arenburg, 605 F.3d 164 (2d Cir. 2010), to support the argument that his competency should be revisited.[5] In Arenburg, the pro se defendant, at a pretrial appearance before the District Court, "produced a signed note that contained several incoherent statements, such as '[o]n the radio stations airing my thoughts all over the world blaming me for being a drug trade,' and '[a]iring my thoughts through the T.V. channels.' " Id., 167. At trial, in his opening statement, the defendant told the jury that "he was 'going to prove that MGM [Studios] is hiding the illegal drug trade in my name through the radio stations that you can call up or they can call you to tell people how to treat me or to find out about me because of MGM.' " His cross-examination of witnesses included references to " 'radio waves' " and " 'microwave channels.' " During trial, the assistant United States attorney expressed concerns about the defendant's ability to represent himself. Id. After the jury returned a verdict of guilty, the defendant's standby counsel filed a motion for a new trial on the ground that the defendant had not been fit

---

[5] The defendant requests that either his conviction be overturned and a new trial ordered or, as in Arenburg, his case be remanded "in order to provide the court with an opportunity to consider whether defendant was competent throughout the proceedings that led to his conviction." United States v. Arenburg, supra, 605 F.3d 165.

to proceed pro se. Id., 168. The District Court denied the motion, stating that counsel had not challenged the defendant's competency to stand trial but, rather, that the question then before the court was whether it was required to revoke the defendant's pro se status. Id. On appeal, the Second Circuit noted that the District Court's duty to order a competency hearing sua sponte "takes on increased significance where, as here, a criminal defendant elects to proceed pro se." Id., 169. The court ultimately held that "the District Court erred by misapprehending its statutory obligations"; id., 168; and "failed to acknowledge its statutory obligation to revisit defendant's competence to stand trial—even in the absence of an application from the parties—if there was 'reasonable cause' to do so." Id., 169.

In the present case, the defendant did not exhibit extreme behavior like the defendant in *Arenburg*.[6] Although his testimony at trial was unpersuasive, it was not incoherent or bizarre. Secondly, there is no evidence

---

[6] *Arenburg* relies on *United States* v. *Auen*, 846 F.2d 872 (2d Cir. 1988), which is also distinguishable. In *Auen*, the court found that "there were abundant indications that Auen [the defendant] may not have been competent to stand trial. During the government's initial investigation, Auen's correspondence with [the special government agent investigating his case] in which he relayed [a story concerning the death of his cat] can only be characterized as the product of a disturbed mind. After Auen was arrested and the government agents discovered his cache of semiautomatic assault weapons, he threatened the government attorneys. Then, when he was brought before Magistrate [Edward M.] Conan, he set forth his various irrational, paranoid beliefs concerning the nature of this country's tax laws and the basis for the prosecution against him. Finally, when Auen appeared before [District Court Judge Thomas J. McAvoy], he continued to ramble concerning his fear of persecution—'psychopolitical terrorism'—and his belief that he was correct and that the government, the court and lawyers in general were somehow responsible for his unjustified incarceration. Taken together these factors lead us to conclude that reasonable cause existed to warrant an inquiry into Auen's competency and that the district court's failure to consider this issue during the pretrial and trial proceedings constituted an abuse of discretion." Id., 874. In the present case, the defendant's behavior was far from the bizarre and irrational behavior exhibited by the defendant in *Auen*.

that the experienced trial court was unaware of its duty to order a competency hearing if it had any doubt as to the defendant's competency. The record, in fact, indicates that the court had confidence in the defendant's ability to comprehend the proceedings, which it noted on multiple occasions.

We conclude, therefore, that the trial court did not abuse its discretion in not ordering a competency hearing, sua sponte. Accordingly, the defendant has failed to prove that his constitutional due process right to a fair trial was violated, and his claim fails to meet the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.