******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* VICTOR
L. JORDAN, SR.
(AC 34478)

Bear, Sheldon and Flynn, Js.*

*Argued March 6—officially released June 17, 2014*

(Appeal from Superior Court, judicial district of New Britain, Alander, J. [motion for competency evaluation]; D'Addabbo, J. [judgment].)

*Pamela S. Nagy*, assigned counsel, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, was *Brian Preleski*, state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Victor L. Jordan, Sr., appeals from the judgment of conviction rendered against him after a court trial on the charge of aggravated sexual assault in the first degree in violation of General Statutes § 53a-70a (a) (1). The court sentenced the defendant on that charge to a term of twenty years in prison, to be served consecutively to a sixty-four year term of imprisonment to which he previously had been sentenced on a series of unrelated charges, plus lifetime sexual offender registration. On appeal, the defendant claims that the trial court abused its discretion by failing to conduct an adequate inquiry into the defendant's competency to stand trial and by failing to order a competency hearing at the start of trial pursuant to General Statutes § 54-56d.[1] We disagree, and thus affirm the judgment of conviction.

I

We begin by describing the tortuous procedural history of this case, which unfolded over the course of twenty-four court appearances from June 30, 2010, through December 6, 2011. On June 30, 2010, at the defendant's arraignment, the court, *Brunetti, J.*, appointed the New Britain public defender's office to represent the defendant. At that initial court appearance, when Assistant Public Defender Mark Johnson reported to the court that the defendant refused to speak with him, the defendant declared, "Ain't nobody representing me. Why are you even speaking for me, man? Don't say shit. Don't say nothing for me." Thereafter, when Johnson attempted to have the defendant sign a document acknowledging that his case had been transferred to the Part A criminal docket in New Britain, the defendant commanded Johnson, on the record, "Get out of my face, man."

On the next scheduled court date, July 12, 2010, the marshals informed the court, *Strackbein, J.*, that the defendant refused to leave the courthouse lockup. Assistant Public Defender Christopher Eddy then advised the court that when he had attempted to speak with the defendant, the defendant told him that he did not want a public defender to represent him. The court thus continued the case for one week, explaining that if nothing changed by the next court date, it would order the defendant to undergo a competency evaluation. Thereafter, on July 19, 2010, when the defendant again refused to have a public defender represent him or to be present in the courtroom, the state moved for, and the court, *Strackbein, J.*, ordered, that the defendant undergo a competency evaluation. In entering its order, the court stated, "[I]t seems to the court that he's not able to assist in his own defense at this moment, and we need to find out whether that's a competency issue." On August 2, 2010, when the defendant next

returned to court, he once again refused to leave the courthouse lockup. The case was thus continued until September 20, 2010, for a hearing on the previously ordered competency evaluation.

The defendant's competency hearing took place on September 20, 2010, before the court, *D'Addabbo, J.* Before the hearing, Assistant Public Defender Claud Chong advised the court that he had attempted to speak with the defendant, but that the defendant did not want the assistance of a public defender, and instead wanted to represent himself. Because, however, the defendant refused once again to appear in the courtroom, the court appointed Chong to represent him for the purpose of the competency hearing. The defendant observed and listened to the proceeding from a lockup area adjacent to the courtroom. Forensic psychologist Fred Storey testified at the competency hearing that he and the other members of his evaluative team had found that "[the defendant] did have the capacity to assist in his defense . . . [and] he did have the ability to understand the proceedings." Following Storey's testimony, the state asked the court to find the defendant competent to stand trial. Chong concurred with the state's recommendation, reporting that he "s[aw] no basis to believe that [the defendant] is not competent to stand trial." The court thereupon found the defendant to be competent, able to understand the proceedings against him, and to assist in his own defense.

On October 26, 2010, Eddy informed the court, *Strackbein, J.*, that the defendant wanted to represent himself and, to that end, asked the court to canvass him. During the canvass, the defendant stated that he was familiar with legal proceedings and the rules of evidence, and that he knew how to defend his case. He acknowledged that he understood the range of possible penalties if he were convicted of the charged offense, and stated "clear[ly] and unequivocally" that he wanted to represent himself and refused to be represented by counsel or even to have counsel on standby. At that time, the court permitted the defendant to represent himself, noting, "I'm sure that the judge who hears your trial will have further questions regarding your self-representation, but at this point the public defender's office will only be standby counsel." The state then offered the defendant a plea bargain on a charge of sexual assault in the first degree, under which he would be sentenced to a term of ten years in prison, to be served concurrently with his current sixty-four year sentence. The defendant, after confirming that he fully understood the state's offer, flatly rejected it, stating, "The answer is no."

On December 21, 2010, the defendant filed a discovery motion, a motion for a bill of particulars, and a motion for a waiver of costs and fees to enable him to hire a private investigator. Upon learning of the defen-

dant's latter motion, Judge Strackbein continued the case until January 3, 2011, in order to research whether the defendant was entitled to hire his own private investigator at the state's expense or whether he was limited to using one provided by the public defender's office. Thereafter, on January 3, 2011, Judge Strackbein held that the defendant would be "able to use the investigator at the public defender's office for investigating [his] case" but that he was not entitled to hire his own private investigator at the state's expense. On March 7, 2011, Judge Strackbein confirmed with the parties that the defendant had received a complete copy of the state's file and that his case would be called for trial.

On April 6, 2011, the defendant again moved the court to compel the state to pay for him to hire his own private investigator. The state argued that the defendant was entitled to use the three investigators from the New Britain public defender's office, but that he did not have the right to hire a private investigator at the state's expense. The defendant responded to the state's argument by calling the prosecutor "an idiot." The court advised the defendant not to speak in that fashion, to which the defendant responded, "I can speak how I want to speak." The court reiterated to the defendant that he could either use the public defender's private investigators for free or hire one at his own expense. The defendant and the court then engaged in the following colloquy:

"The Defendant: There is a conflict of interest. I'm going to tell you what the conflict of interest is, because if they represent me, there's going to be a problem. There's going to be a serious problem.

"The Court: What is the serious problem, sir?

"The Defendant: No. You just don't understand that.

"The Court: Well, then you have to tell me.

"The Defendant: So, I would allow them to represent me, and I'm going to do what I'm going to do regardless—

"The Court: What is the serious problem?

"The Defendant:—and then we can create the conflict of the interest.

"The Court: I'm asking you what the serious problem would be.

"The Defendant: The problem is that I got sixty-five years. I don't give a damn about doing whatever I have to do to prevent—to establish that conflict of interest, so don't start pissing on me and telling me it's raining, Judge.

"The Court: Okay. Here's the situation.

"The Defendant: So, no, there is no deal. You are either going to give me this right or else they will repre-

sent [me] and I'll do what I have to do, which I have no problem of doing.

"The Court: I'm unclear about what you're saying what you're going to do.

"The Defendant: I don't have to make it clear to you. They know what it is. . . .

"The Court: If you want your own [investigator], you'll have to hire your own.

"The Defendant: The end product is going to be the same.

"The Court: I don't know what that means.

"The Defendant: You're going to get somebody hurt, that's what you're going to do.

"The Court: I don't know what that means, 'to get somebody hurt.'

"The Defendant: It means exactly what it means.

"The Court: Are you threatening someone now?

"The Defendant: Yes, I am.

"The Court: And who are you threatening?

"The Defendant: I'm telling you [that] you're going to get somebody hurt, period.

"The Court: Who? Who is going to be hurt?

"The Defendant: It is what it is.

"The Court: So, you're going to make threats. That's a big problem.

"The Defendant: Well, whatever; it means nothing to me. I'm asking you to give me my rights—

"The Court: Okay. According to—

"The Defendant:—of what I'm due. If you're not going to grant me my rights, of what is due, then I might as well become something that's other than that.

"The Court: I don't know what that means.

"The Defendant: Well, then, of course you don't.

"The Court: But you're not entitled—

"The Defendant: You're just as much [of] an idiot as this guy is.

"The Court: Well, that's very nice. Okay. So, that motion for your own investigator is denied.

"The Defendant: Yeah, of course."

Jury selection was scheduled to begin on April 13, 2011, before the court, *Alander, J.*, who began by canvassing the defendant about his decision to represent himself at trial. The defendant responded that he had already been canvassed and was not going to answer any of the judge's questions. He also told the court to

"cut through all the bullshit" and to "just get to the point" because "we're basically done here," and then proceeded to head out of the courtroom. The court instructed the marshals to take the defendant into the holding cell adjacent to the courtroom, but the defendant stated that he wanted to be brought downstairs to the lockup. The marshals escorted him to the lockup, and the court advised standby counsel that the defendant had waived his right to be present by using profanity and failing to act appropriately in court. The court further advised that it would give the defendant every opportunity to represent himself, but that it would not let him "torpedo [the proceedings], which, frankly, appears to be his intent." The court then scheduled jury selection to begin on April 26, 2011.

Thereafter, on April 26, 2011, when the defendant appeared before Judge Alander for the start of jury selection, the defendant refused to change out of his orange jumpsuit or to speak to the court, prompting the court to warn him, "If you continue to behave like this, which I consider to be an impediment to the orderly proceedings of this trial, you will be taken into the holding cell where you can observe these proceedings by video and listen by audio. We will offer you that opportunity. Last time you were here, you refused to go into that cell and were taken downstairs and weren't able to listen. I will also—if you continue to act like this—find that you've waived your right to represent yourself, and you've waived the right to confront the witnesses against you and to be present in court. I will appoint the public defender to represent you, and we will proceed with this trial in your absence. So, you just need to know that your behavior is not going to stop this trial. It's just going to mean that you're not going to be a participant in it, and you won't be a participant in it because of the behavior that you are exhibiting." The court then gave the defendant another opportunity to change out of his orange jumpsuit so as not to prejudice himself in front of potential jurors. When the defendant refused to respond to the court, the court asked the marshals to take him to the adjacent holding cell, where he again refused to go. In light of his refusal, the marshals took him downstairs to the lockup.

The court, *Alander, J.*, then appointed the public defender's office to represent the defendant, despite Chong's statement to the court that the appointment should not be made because the defendant had voluntarily, knowingly, and intelligently waived his right to counsel, and, "on one occasion [had] threatened [Chong] with violence if [Chong] was to come near him again and attempt to speak with him." Although the court recognized the difficult position in which it was placing counsel by ordering him to represent the defendant, because he had "clearly indicated [that] he has no intention of cooperating with [counsel], and, in fact,

has threatened members of the public defender's office with violence," it reasoned that the appointment of the public defender's office was "[a] wiser course of action . . . than to have [the defense] table totally empty . . . [because a] less than perfect defense is better than no defense . . . ." Chong then advised the court that he had a scheduling conflict on the dates proposed for the commencement of jury selection, and thus that Eddy, of the public defender's office, would represent the defendant instead.

On May 11, 2011, at a hearing on Eddy's later motion to appoint a special public defender to represent the defendant,[2] Judge Alander noted that the defendant was present in the courthouse but refused to leave the lockup. The court stated, "It's clear to me that he's trying to disrupt and delay these proceedings . . . [and] it's clear to me that he wants to do what he can to make sure this trial doesn't proceed. So, his absence means that he can't represent himself, and the appointment of the public defender's office to represent him stands." The court granted the motion and continued the case for the appointment of a special public defender and the assignment of a trial date.

On June 27, 2011, special public defender Andrew Cates, who had been appointed to represent the defendant, advised Judge Alander that his client wanted to address the court. The following colloquy ensued:

"The Defendant: First and foremost, I filed a motion for stay of proceedings because I have a motion for review with the Appellate Court filed, so—

"The Court: Before we get to that issue, I have to decide whether you can represent yourself or not.

"The Defendant: That's already been made clear.

"The Court: . . . [W]hen you—last time you were here before me and you refused to talk, I found that by your refusal to talk, you waived your right to represent yourself because, obviously, you can't represent yourself if you're not going to speak. You now, apparently, changed your mind and you're willing to speak. So, the question now is whether you want to represent yourself.

"The Defendant: Yes.

"The Court: Okay. Now, you're appearing in court here without a shirt. For some reason you've decided that you don't want to wear a shirt.

"The Defendant: Hey, this is—

"The Court: In order for you to represent yourself, you're going to have to be fully clothed.

"The Defendant: I wasn't—my people wasn't fully clothed when you brought them from fucking Africa like this, so it is what it is. . . . Under the circumstances, I'm a civilized savage, basically, because that's basically how we came here, so—and, basically, when

you deny me my rights, then I'm partially at—I'm partially a citizen of the United States with some rights in lieu of civilization, but at the same time, a savage, so this is good. I fucking be butt naked, I'll be standing here butt naked. I was born this way, so it is what it is. What's the—

"The Court: You may—

"The Defendant:—difference of me having

"The Court: You may have been—

"The Defendant:—a monkey suit on like you or this guy and me being here with this on. It's irrelevant.

"The Court: . . . If you continue in this fashion—

"The Defendant: What fashion is that?

"The Court: Not being clothed, not being fully clothed, using profanity. You're not going to be able to represent yourself . . . .

* * *

"The Defendant: I'm willing to comply.

"The Court: Okay. You have to behave respectfully. You can't be using profanity. You're willing to observe that rule?

"The Defendant: To the best of my ability. . . . I'm partially savage so, you know, that might come out.

"The Court: . . . [I]t's not hard to obey a rule of not using profanity if you're willing to.

"The Defendant: Man, I grew up in the hood.

"The Court: That may be—

"The Defendant: Only thing I do know how to. I could speak pretty well. I have an extensive vocabulary, but at the same time it comes naturally to me so you have to forgive me. So, under the circumstances, just because I speak that way and I may express myself at times that way, you're going to hold that against me just like as if you use a certain word that I don't comprehend, that's unfamiliar to me, do I address the court and say I object because I don't comprehend what you're saying, you know, if you use . . . a different terminology. If I started speaking to you in Mandarin, what you going to do, bring an interpreter here?

"The Court: . . . It's a very simple question for which you need to answer yes or no.

"The Defendant: Well, I need an interpreter at the same time, Your Honor.

"The Court: Are you willing to observe the rule that you not use profanity?

"The Defendant: Yeah, if—of course, but I'm going to be speaking probably in Mandarin or Spanish, so, therefore, yeah, I'm going to need an interpreter

because you guys are not going to comprehend what I'm saying because my vocabulary in English is not that extensive. So, if that's the case, I'm going to need an interpreter because I'm going to speak to you in Mandarin.

"The Court: . . . [Y]ou know and I know that you speak English.

"The Defendant: Well, it's limited, so I'm making it clear on the record. But I could speak—I speak extensive Mandarin.

"The Court: It is clear to me . . . both by your past behavior and your present behavior that you're not willing or able, I'm not sure which, I think it's willing, to observe the rules of the court and behave respectfully so that this trial can proceed in an orderly manner.

"The Defendant: Mm-hm.

"The Court: And it's clear to me that your intention here is to disrupt these proceedings so that they don't proceed in any manner. Given that, I'm not going to allow you to represent yourself because there's no doubt in my mind that it will continue to be the circus that you're trying to make it right now. So that—

"The Defendant: It's already a circus.

"The Court: So, given your past proclivity in terms of not letting counsel represent you and disrupting the proceedings, I'm not going to allow you to represent yourself, so Mr. Cates is your lawyer.

"The Defendant: This guy don't represent me. That's out of the question.

"The Court: He is going to represent you.

"The Defendant: No, he's not.

"The Court: So, now what needs to happen—

"The Defendant: And what's that?

"The Court: Is, you need to get clothes on. Either we're going to offer you civilian garb so that you don't prejudice yourself in front of your jury—

"The Defendant: This guy don't represent me right here.

"The Court: Well . . . I've already made my ruling.

"The Defendant: It's not happening.

"The Court: So, what you need to do is get—

"The Defendant: What's that?

"The Court: You need to get—

"The Defendant: This guy don't represent right here. Get out of my way, man.

"The Court: So . . . here's what you—

"The Defendant: Get out of my way. . . . No. Get

out of my way. Get off me, man. Don't touch me. Shut up.

"The Court: We need to take him downstairs because he's thrown paper at Mr. Cates, he's lifted, I think it was a book, indicating he was about to throw that before [the] marshals intervened. . . . [Y]ou're going to be taken downstairs. You're welcome to come back if you're going to behave yourself and obey the rules of the court. If you either refuse to come back or don't obey the rules, we're going to continue to proceed without you. You're welcome to stay in the holding cell we have for you so you can listen to and observe the proceedings, and if at any point you indicate that you're willing to behave yourself, you're welcome to return, but marshals, at the present time, please take him downstairs."

Following the defendant's removal from the courtroom, Cates moved to withdraw from the case, arguing that his lack of communication with the defendant had hampered his investigation and would continue to do so as the case went forward. Although the court voiced sympathy for the difficult position in which the denial of the motion to withdraw would place Cates, it held that it had no other choice but to require Cates to continue to represent the defendant despite his lack of cooperation because the defendant was unable "to represent himself because he absolutely refuse[d] to comply with the bare minimum required to appear in court." The court then proceeded with jury selection.

Following the luncheon recess, a marshal reported to the court that the defendant "was banging on the cell doors, yelling and screaming and complaining of chest pain. He indicated that he had severe chest pains and was asking for immediate medical attention." The court, expressly chose to "err on the side of caution . . . [by] authoriz[ing] that [the defendant] be brought to another facility so that he could receive medical attention." In light of the defendant's absence from the courthouse, the court suspended jury selection for the remainder of the day and continued the case until the next morning.

The next morning, on June 28, 2011, the defendant appeared before Judge Alander to continue with jury selection. The defendant sought to file motions with the court, but was informed that he could not file any motions on his own behalf because he was represented by Cates as a result of his disruptive behavior the day before. The defendant stated that he wanted to dismiss Cates as counsel because there had been no communication between them and because Cates had not performed any investigation, nor had he called or visited the defendant. The court advised the defendant that it would not fault Cates when, in actuality, it was the defendant who had refused to communicate or cooperate with him. The court denied the defendant's motion and asked the defendant if he wanted to stay in the

courtroom for the continuation of his jury selection. The following exchange took place:

"The Defendant: Come on—let's go, man—

"The Court: So, you do not want to remain, is that correct?

"The Defendant: Come on, I need medical attention, man.

"The Court: Okay. . . . [L]et me know if you want to return—

"The Defendant: Please—

"[Defense Counsel]: Medical attention on the mittimus please.

"The Defendant: I need medical attention right now.

"The Court: And what's the nature of the medical issue?

"The Defendant: My heart, I can't breathe.

"The Court: Okay, that was the same problem we had yesterday—

"The Defendant: Yeah, but right now I gotta be seen—

"The Court: They checked you out at the prison, I take it.

"The Defendant: I'm havin' the same problem right now, so therefore get me medical attention, please.

"The Court: If we could take—[the defendant] apparently wants to go downstairs—

"The Defendant: No, get me medical attention—

"The Court:—since he's facing the door—

"The Defendant:—I'm feelin' faint—

"The Court: Marshal, if you could take him downstairs.

"The Defendant: (Indiscernible.)

"The Court: The record should reflect that [the defendant] just laid down on the floor of the courtroom. We'll take a recess so [the defendant] can be returned to his cell."

The court later summarized the defendant's behavior for the record as follows: "[A]fter [the defendant] decided to lay prostrate on the floor, the marshals had to drag him out of the courtroom; he refused to get back on his feet. He was also complaining, as he did yesterday, of chest pains. It's my understanding that he was checked out at the correctional facility and they found no concern, no medical issue with [the defendant], which is why he was transported back here today.

"It's my belief that he's complaining of chest pain once again as an effort to further disrupt this proceeding. This has been my experience with him from the

very beginning, that [the defendant] does whatever it takes, in his mind, to attempt to disrupt these proceedings, and that is part and parcel of his efforts to do that. The marshal indicated to me [that] the correction officers wanted to take him back to the facility because of his statements with [respect to] chest pain.

"I said I didn't want him taken back to the facility because I would have to—I would be concerned about suspending jury selection, and that he needed to be medically checked out here and remain in the building during jury selection. The marshal also indicated to me that yesterday he was banging on the bars, and yelling and screaming and he was very disruptive downstairs, and the marshal was concerned that that might happen again, and I told the marshal to let me know if that occurred and we can proceed accordingly."

Thereafter, during voir dire, a marshal informed the court that the defendant was acting out in his cell, kicking and screaming, and continuing to complain of chest pains. The correction officers asked to transport the defendant back to the correctional facility for a medical examination. The court responded, "It's clear to me [that] he does not need medical attention; we went through this exact same behavior yesterday. He didn't, when he was checked out, he didn't need any medical attention, he wasn't admitted to any medical facility. It's clear to me that . . . this is just further efforts on his part to disrupt this trial, as I've said already. So, I'm going to continue with jury selection. . . . He's clearly waived his right to be present, and . . . this is just a ruse to be taken back to the correctional facility. . . . There's absolutely no doubt that this is intentional conduct on his part so that he doesn't have to be here." The court went on to state that "[t]his is all about the show. [The defendant] likes to come to court and put on a show and attempt to be in control of the proceedings and do it his way. . . . [H]e likes to come to court to see how far he can push things and then when things don't get pushed to the degree he'd like them to be pushed, he decides [that] he doesn't want to participate anymore; that's my view of what's going on here."

Later that day, following the luncheon recess, Cates asked the court to order a competency evaluation of the defendant pursuant to § 54-56d. The court promptly engaged in the following, extended colloquy with defense counsel and the state's attorney regarding the defendant's competency to stand trial:

"The Court: So, you have some concerns about [the defendant's] mental competency?

"[Defense Counsel]: Well, I mean, given his actions, he—I do have some concerns because even though he seems to be—a lot of this stuff maybe is premeditated, but it's not rational. He's not assisting with his—his

case, and I can't—I can't determine whether that's because he doesn't want to or whether it's because he can't.

"The Court: Am I correct in that the entire basis for your request has to do with his behavior in court?

"[Defense Counsel]: No, it [has] to do with his behavior the two times I have visited him—

"The Court: Okay.

"[Defense Counsel]:—the time my intern—or my investigator tried to visit with him and his behavior here in court.

"The Court: I'm sorry. Is that because he refused to discuss this case or cooperate with you or the investigator? Did he say anything to cause you to be concerned about his mental competency other than his refusal to cooperate?

"[Defense Counsel]: Based on that alone, I wouldn't ask for the evaluation, but that—the totality of that combined with some of the stuff that he was saying yesterday—needing a Mandarin interpreter—

"The Court: But—but could you answer my question? I'm not sure—

"[Defense Counsel]: No, it's not based on that alone.

"The Court: Okay. But am I correct that it's—it's not that he said anything particular to you outside of court that causes you to question his mental competency?

"[Defense Counsel]: No, it's not.

"The Court: Okay. So, it's based upon his refusal to cooperate and his behavior in court?

"[Defense Counsel]: And his behavior in court and the way he behaved when I visited—tried to visit him.

"The Court: Yeah, I just want to make sure because I've obviously observed his behavior in court; I just want to make sure that you don't know something I don't know in order for me to rule appropriately on this request.

"[Defense Counsel]: Well, hopefully, I'm not in violation of any Practice Book rules, but you know everything. I made you privy earlier today to what I know, Your Honor.

"The Court: Okay. But—okay. Mr. [prosecutor], do you have a view on this?

"[The Prosecutor]: I can indicate for background purposes to the court on July 19, 2010, [the defendant] refused to appear in court and that was consistent with prior appearances, where he would refuse to appear in court. After that refusal to appear in court and based on his fairly consistent refusal to appear in court, Judge Strackbein ordered a § 54-56d evaluation, and that was

ordered on my motion, based on his refusal to come up and appear.

"He was evaluated, there was a hearing held before Judge D'Addabbo on September 20, 2010. For the purpose of that hearing, [the defendant] was represented by Attorney Chong. Dr. Storey testified in connection with that. The report of the forensic evaluation team was admitted, and Storey testified that both prongs of the test were met by [the defendant]. And Judge D'Addabbo found that [the defendant] was capable of assisting in his defense and, in fact, was able to understand the nature of these proceedings.

"I will indicate that on that day, on September 20, 2010, in connection with that hearing, my notes indicate that, again, [the defendant] refused to appear in court for that hearing. Subsequently, on October 26, after Judge D'Addabbo made his findings, [the defendant] did agree to appear in court, and he was canvassed in connection with pro se representation by Judge Strackbein. He did some other things on the record, and the case was then put on the trial list.

"I've had the same opportunity to observe [the defendant] in court that Your Honor has. It does seem to me that if there is a lack of him assisting [defense counsel], that is not a function of [the defendant]'s inability to assist [defense counsel], it's a function of his unwillingness to assist [defense counsel], and that's an unwillingness that [the defendant] has manifested throughout the course of these proceedings. I will also note that—

"The Court: Even prior to the evaluation?

"[The Prosecutor]: Even prior to—yes, sir, yes, sir. And I will also note that from the state's perspective, [the defendant] has been very active in attempting to file, and at the time he was pro se, filing legal motions and things of that nature. It does strike me that he has a very good understanding of the proceedings and the nature of the proceedings against him. So, from the state's perspective, [the defendant] is, to be blunt, simply trying to manipulate and malinger and disrupt the proceedings in any fashion that he can.

"The Court: Did you want to be heard any further, [defense counsel]?

"[Defense Counsel]: Just a small bit. And I have the greatest respect for the [prosecutor]'s opinion, and I—and I find myself moving in that direction, too, but I'm not confident—I don't think that I—I'm not—I'm a lawyer, not a psychologist, I can't make that determination. I understand—I know there was an evaluation done before, but that was long before I came into this case, and so, going on—just on my experience, I'm just not comfortable saying that he is malingering, maybe he is, but—and if I was a betting man, maybe I would—I might take that bet, but I don't—but this is liberty and liberty—is at stake, and—and I—I just don't feel

comfortable—making that conclusion myself, Your Honor.

"The Court: No. I understand. . . . Does anybody want to be heard any further?

"[Defense Counsel]: Not on this motion—

"The Court: Okay.

"[Defense Counsel]:—but on another motion.

"The Court: Now, let me deal with this motion first. I've reviewed—did you, Mr. [prosecutor] want to be heard?

"[The Prosecutor]: No, Your Honor.

"The Court: I reviewed the evaluation report, and in August, it was the unanimous view of the evaluators that [the defendant] was—was competent to stand trial. He was both able to understand the nature of the proceedings against him and to assist in his own defense. And as I understand it, correct me if I'm wrong, [defense counsel], are you concerned with both prongs?

"[Defense Counsel]: I'm concerned with both prongs, Your Honor.

"The Court: Okay.

"[Defense Counsel]: If I may, just—[because] we've been talking about an ability to assist, but ability to understand the proceedings. Yesterday, you tried—you tried, Your Honor, to canvass him on—on the—on the pro se, he wanted to represent himself as to following the rules, he seemed to kind of get it, but then, either, I mean, as—as the [prosecutor] mentioned, maybe he is malingering, but on the other hand, he could not demonstrate the ability to understand two simple rules, be polite and don't use profanity.

"The Court: Yeah. There is no doubt in my mind that [the defendant] is competent and that this is—this behavior is intentional behavior on his part to disrupt the proceedings, and that's been crystal clear to me from his—his behavior. And it appears that, at least based on this evaluation, that his refusal to cooperate with you is based upon his distrust of lawyers. He basically thinks we're all in cahoots with the [prosecutor], including me, all judges, and that we're just out to get him convicted.

"And I think that's why he's seeking to disrupt these proceedings, is his feelings that the end result is preordained, so what's the point in letting it go to a conclusion. And that every day he comes in here in a further effort to disrupt the proceedings, he just tries something new and different every day in the hopes to get this off track. So, based upon the behavior I've seen, I don't find it to be evidence of—of incompetence.

"[Defense Counsel]: May I say just one further thing—

"The Court: Sure.

"[Defense Counsel]:—and then I'll—I'll rest.

"The Court: Yeah, go ahead.

"[Defense Counsel]: This is a very defensible case, Your Honor. He has the whole file; he has more than I have that he's carrying around with him. He actually has more than I have, and what I have, there's a lot— it's not a—a foregone conclusion, and anybody with any kind of rational ability, I think, would see that.

"And, I mean, I—I take your point, Your Honor, that he's suspicious [that] we're all in cahoots, we're all out to—to—to get him, but on the other hand, he—if he had the ability to follow your instructions, Your Honor, and if he could understand the documents that I have that I know he has, he would see that this is a defensible case, and if he didn't trust me, he would—he would've made it possible for himself to, yesterday, to go forward pro se with me as standby.

"The Court: But I think the point you're missing that is clear to me from this evaluation is, he thinks the whole system is racist, and that we're all out to get him, and that we're going to convict him even though he's innocent. So, if that's your view, then it would be rational to try to disrupt these proceedings and not let them go to conclusion because we're all just out to get him anyway.

"And I don't find that position to be one rooted in mental illness, that's his worldview, and that's his view of how he's been treated by the criminal justice system from the very beginning. Given that view, I think his behavior is very rational and not the product of—of mental illness.

"[Defense Counsel]: May I ask if that—that was—I didn't have a chance to review the report, Your Honor. Is that worldview demonstrated in—

"The Court: Well, let me just, I think, quote parts of it from—for you, that may be helpful, and I'll certainly give you a chance to look at it—

"[Defense Counsel]: Oh, I would appreciate that.

"The Court: I thought you had seen it.

"[Defense Counsel]: I'm sorry, I haven't, I could've made better efforts.

"The Court: [The defendant] made statements indicating that he believes the legal system and these evaluators were racist. And there were some other statements in here, and also with respect to the—let me see. [The defendant] stated the judge works in collaboration with other state's attorneys and attorneys. When asked if the judge is against him, he said nine times out of ten. When asked if that's how it's supposed to be, he stated, not according to the constitution.

"If I thought there was even a possibility that he was incompetent, I would not hesitate to order a—a competency evaluation, but based upon this evaluation and what I've observed, I do find and do believe that this is all intentional behavior, as I've said repeatedly, to disrupt these proceedings.

"[Defense Counsel]: Thank you for—

"The Court: Okay.

"[Defense Counsel]:—for hearing the motion, Your Honor.

"The Court: And he's doing a great job of slowing us down, but he hasn't disrupted them totally yet. Anything else? Did you have something else?

"[Defense Counsel]: None, Your Honor."

For the remainder of the day, the court proceeded with jury selection. The parties completed jury selection for this case on June 30, 2011, without the presence of the defendant.[3]

On July 25, 2011, when the defendant appeared in the courtroom for the start of the evidentiary portion of his trial, Judge Alander warned him that he must refrain from disruptive behavior in order to exercise his right to be present in the courtroom. The defendant then objected to the trial going forward, claiming that he had never elected to be tried by a jury, and instead invoked his right to be tried by the court. After the defendant spoke with Cates about his decision to choose a bench trial, the court asked the defendant several questions to ensure that he understood his right to a jury trial, that a jury had already been selected and was ready to proceed, that he could not change his mind once he elected to be tried by the court instead of a jury, and that trial would commence that morning. The court found that the defendant's decision to waive his right to a jury trial, and instead to proceed with a trial before the court, was made knowingly and voluntarily. Judge Alander then dismissed the jury and recused himself as the trial judge in this case upon realizing that the state had filed a Part B information against the defendant, which would have resulted in Judge Alander acting as both the fact finder and the trial judge in the defendant's court trial.[4]

On July 27, 2011, evidence in the defendant's trial began before Judge D'Addabbo, who had been assigned to the case in lieu of Judge Alander. The court began by addressing the state's motion to use reasonable physical restraints on the defendant in light of his past verbal and physical threats toward defense counsel. The defendant objected to the use of restraints, but the court granted the state's motion and ordered the defendant to remain restrained in leg shackles and handcuffs. The state then proceeded with its case-in-chief.[5] The defendant was present in the courtroom throughout the trial, wore

appropriate attire,[6] and never acted disruptively.

On the third day of trial, August 2, 2011, the defendant testified in his own defense. Before he took the witness stand, he was engaged by the court in the following canvass as to his decision to testify, throughout which he was respectful and nondisruptive:

"The Court: Okay. Before [the defendant] takes the stand—what I normally do . . . with every defendant is to make sure that they understand what is occurring. So, I'm going to ask you some questions before you take the stand. All right, sir?

"The Defendant: Yes, Your Honor.

"The Court: All right. First question, have you taken any medication, drugs or alcohol within the last twenty-four to forty-eight hours that would in any way affect your ability to think, to hear, to comprehend, to understand?

"The Defendant: No, Your Honor.

"The Court: Okay. Have you had enough time to speak with your attorney, Mr. Cates, concerning taking the stand and testifying in this case, and obviously the— the option of not testifying in this case?

"The Defendant: Yes, Your Honor.

"The Court: Do you need any more time to do that?

"The Defendant: No, Your Honor.

"The Court: Okay. Now, you understand that when you take the stand and testify in this case, it's—in any case, you can't get on the stand and say, I'll answer my attorney's questions, but then, when the cross-examination comes, I'm not going to answer them. You understand you have to answer questions that are put forward by both attorneys? You understand that?

"The Defendant: Yes, Your Honor.

"The Court: Okay. And do you understand [that] if you did take the stand, obviously the court will consider credibility just as any other witness that takes the stand, including that you have an interest in the outcome of the case? You understand that?

"The Defendant: Yes, Your Honor.

"The Court: And if you didn't take the stand, the court would not use the term hold it against you, but basically make its decision solely on the evidence that's presented in the trial. Do you understand that?

"The Defendant: Yes, Your Honor.

"The Court: Having—you indicated to me that you've had enough time to talk to Mr. Cates about this; is [it] your desire to take the stand and testify in this case?

"The Defendant: Yes.

"The Court: Is anyone forcing you or threatening you in any way to do that?

"The Defendant: No, Your Honor.

"The Court: So, it's an act of your own free will?

"The Defendant: Yes, Your Honor."

The defendant proceeded to testify on his own behalf and was responsive to and respectful of both counsel and the court throughout his direct and cross-examination.

On August 11, 2011, the court found the defendant guilty of aggravated sexual assault in the first degree. The defendant's sentencing was scheduled to take place on December 1, 2011, before Judge D'Addabbo, but it was brought to the court's attention that the defendant was complaining of chest pains and requested medical attention. The prosecutor advised the court that the defendant "has a history of malingering symptoms to avoid court attendance. That history includes prior trips during the pendency of this case to the emergency room with similar nonspecific complaints of chest pains that have resulted in him being immediately discharged from the emergency room after medical evaluation and found nothing wrong, as well as an incident of him collapsing in the courtroom, which led, again, to a trip to the emergency room." In an abundance of caution, the court ordered the defendant to be examined and rescheduled his sentencing for December 6, 2011.

On December 6, 2011, when the defendant's sentencing took place before Judge D'Addabbo, the defendant was present in the courthouse but refused to leave the lockup to appear before the court. Cates informed the court that the defendant did not want to be present for sentencing, that no one was forcing or threatening him not to be present, and that he seemed calm and in his right mind. The court concluded that the defendant "does not want to be in front of the court, he wants to absent himself. That is an intentional act on his part. . . . [T]he court finds an intentional act on the defendant's part to absent himself from the sentencing hearing today. And, therefore, also a voluntary waiver on his part not to be heard as it relates to sentencing." The court also noted that the defendant had "refused to cooperate with the preparation of the presentence investigation . . . so they've attached . . . a previous presentence investigation." The court heard argument from both counsel and then proceeded to sentence the defendant to a term of twenty years' imprisonment, to be served consecutively to his present sentence, plus lifetime registration as a sex offender. This appeal followed.

## II

We begin with the undisputed principle that "[t]he conviction of an accused person who is not legally

competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. . . . This rule imposes a constitutional obligation, [on the trial court], to undertake an independent judicial inquiry, in appropriate circumstances, into a defendant's competency to stand trial . . . . General Statutes § 54-56d (a) codified this constitutional mandate, providing in relevant part: A defendant shall not be tried, convicted or sentenced while the defendant is not competent. [A] defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense.

"This statutory definition mirrors the federal competency standard enunciated in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). According to *Dusky*, the test for competency must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (Citation omitted; internal quotation marks omitted.) *State* v. *Paulino*, 127 Conn. App. 51, 62, 12 A.3d 628 (2011).

"Although § 54-56d (b) presumes the competency of defendants, when a reasonable doubt concerning the defendant's competency is raised, the trial court must order a competency examination. . . . Thus, [a]s a matter of due process, the trial court is required to conduct an independent inquiry[7] into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . . The trial court should carefully weigh the need for a hearing in each case, but this is not to say that a hearing should be available on demand. The decision whether to grant a hearing requires the exercise of sound judicial discretion." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 21–22, 751 A.2d 298 (2000).

The defendant here claims that his conviction should be reversed and the case remanded for a new trial because Judge Alander's independent inquiry into his competency to stand trial was inadequate and violated his state and federal constitutional right not to be deprived of his liberty without due process of law. Specifically, the defendant claims that the court erred in denying his attorney's request for a competency evaluation because the only input it sought and received on

that subject came from defense counsel and the prosecutor, without a personal canvass of the defendant to determine if such an evaluation was warranted. The state disagrees, contending that the court adequately performed an independent inquiry into the defendant's competency by engaging in a lengthy colloquy with both defense counsel, who had raised the issue, and the prosecutor, during which both counsel apprised the court of all the evidence that had come to their attention that bore on the issue of the defendant's possible incompetency since the time of the defendant's prior competency evaluation. The state claims that the defendant's argument necessarily fails because defense counsel did not articulate any independent factual basis, which, if true, would constitute substantial evidence of the defendant's mental impairment. We agree with the state.

"We review the court's ruling on a motion for a competency evaluation under the abuse of discretion standard. . . . In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Citation omitted; internal quotation marks omitted.) *State* v. *Kendall*, 123 Conn. App. 625, 651, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

The court here did not abuse its discretion by denying the defendant's motion for a competency evaluation because it was reasonable for it to conclude that the defendant had failed to raise a "reasonable doubt concerning the defendant's competency . . . ." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 253 Conn. 21. Specifically, after defense counsel made his § 54-56d motion, the court inquired of him, and of the prosecutor, about their observations of and interactions with the defendant both inside and outside of the courtroom. Its evident purpose in conducting these colloquies, which it pursued with great care, was to determine if counsel had witnessed any conduct by the defendant other than that which he had openly engaged in before the court itself, prior and subsequent to the court's initial finding that he was competent to stand trial, which might otherwise raise a reasonable doubt about his competence. The court clearly was seeking to learn of conduct other than the noncooperation with counsel or the court, the use of profanity and the refusal to wear clothing, which it observed over the course of several court appearances, which might suggest confusion, thought disturbance, mental disorganization or other forms of mental illness impairing the defendant's ability to understand his legal predicament and assist in his own defense.

Before ruling on defense counsel's motion for a sec-

ond competency evaluation, the court took great pains to assure itself that the only basis for the motion was the same pattern of disruptive behavior which it had observed in open court and come to regard as an intentional and fully rational effort by the defendant to obstruct his prosecution. The court thus questioned counsel on this subject in an extended colloquy which revealed that apart from disruptive behavior of the sort it had witnessed, there was no other basis known to counsel for questioning the defendant's competency.[8] In those circumstances, absent any basis for questioning the defendant's competency other than his pattern of disruptive conduct, the court was not required to conduct any further inquiry on that subject, either with counsel or with the defendant personally, before ruling on counsel's motion for a second competency evaluation.

Despite these colloquies with counsel, the defendant claims that the court failed to conduct an adequate inquiry to determine if a competency evaluation was warranted because it denied the motion without canvassing the defendant personally. The defendant claims that the court was required to canvass him, and not just inquire of his counsel, in order to ascertain if a competency evaluation was warranted in this case. In making this argument, the defendant relies on our recent opinion in *State* v. *Dort*, 138 Conn. App. 401, 411, 51 A.3d 1186, cert. granted, 307 Conn. 931, 55 A.3d 769 (2012).[9] In *Dort*, we reversed the judgment of the trial court following its denial of the defendant's request for a competency examination because "the court failed to conduct an appropriate inquiry into the defendant's competence . . . [which] violated the defendant's due process rights." Id., 412. As in the present case, the defendant in *Dort* had been found competent to stand trial following an initial competency evaluation. Thereafter, before the start of jury selection, his counsel requested a second competency evaluation, which was denied by the court following a colloquy with defense counsel and a review of the previous competency evaluation report. Id., 407.

The trial court in *Dort*, however, "did not make any reference to the defendant's behavior or any relevant communications with the defendant . . . [and] refused the defendant the opportunity to address the court on this issue, which would have given the court an opportunity to make these key observations." Id., 412. In the present case, by contrast, the court specifically referenced the defendant's behavior,[10] which it had observed firsthand on multiple occasions, and at no time refused to provide the defendant an opportunity to address the court on the issue of his competency. In fact, the defendant had voluntarily absented himself from the courtroom due to his disruptive behavior, and thus the court's inability to canvass him directly was a situation created by his own design. Moreover, contrary to the

defendant's assertion, our holding in *Dort* does not stand for the proposition that a trial court is required to canvass the defendant personally as part of its independent inquiry into his competency to stand trial.[11]

The defendant also claims that the court improperly relied on his August 24, 2010 competency evaluation report when denying his request for a second competency evaluation because that evaluation had occurred nearly one year before his counsel's request for a second evaluation. The defendant, however, "has not cited, and we have not found, any case law that establishes a bright line rule as to when a competency report becomes stale." *State* v. *Mordasky*, 84 Conn. App. 436, 447, 853 A.2d 626 (2004). Rather, the court's inquiry when deciding whether to order another competency evaluation is "whether the defendant's condition has materially changed since a previous finding of competence." Id. The defendant did not produce any evidence that his condition had changed at all, let alone materially, since the date of his first competency evaluation. Moreover, as previously discussed, the August, 2010 competency evaluation was only one source of information upon which the court relied in making its decision. Because the defendant failed to raise a " 'reasonable doubt concerning [his] competency' "; *State* v. *Johnson*, supra, 253 Conn. 21, we conclude that the court properly denied counsel's request for a second competency evaluation.

The record in this case fully supports the court's determination that the defendant's behavior was not the result of any incompetence to stand trial, but rather was the result of his own deliberate attempt to disrupt and delay the proceedings against him. The defendant calmly, coherently, and appropriately answered Judge Alander's questions regarding his decision to waive his right to a trial by jury and his election instead to be tried by the court. This cooperative and appropriate behavior exhibited by the defendant demonstrates that, when he chose to do so, he was capable of conducting himself in a nondisruptive manner and that he was competent to stand trial. See *State* v. *Murray*, 28 Conn. App. 548, 554, 611 A.2d 916 (rejecting claim that trial court erred in not ordering competency hearing because "defendant's behavior in lying on the floor of the courtroom was viewed not as an act of incompetency but rather as a maneuver to attempt to dismiss his counsel and delay the trial"), appeal dismissed, 225 Conn. 524, 624 A.2d 377 (1993); *State* v. *Johnson*, 22 Conn. App. 477, 489, 578 A.2d 1085 (defendant's "obstreperous, uncooperative or belligerent behavior did not obligate the court to order a competency examination" where record showed he had "ability to cooperate but did not want to do so"), cert. denied, 216 Conn. 817, 580 A.2d 63 (1990).

At the conclusion of its ruling on the motion for a

second competency evaluation, the court so much as stated that if "there was even a possibility that he was incompetent, I would not hesitate to order . . . a competency evaluation, but based upon this evaluation and what I've observed, I do find and do believe that this is all intentional behavior, as I've said repeatedly, to disrupt these proceedings." On the basis of the evidence presented to it, the court determined that the defendant's disruptive behavior did not constitute substantial evidence of his mental illness so as to raise a reasonable doubt as to his competency. That determination cannot be said to have been an abuse of discretion. Rather, Judge Alander's interactions with the defendant and his patience with his disruptive behavior were both respectful and tolerant. He conducted a thorough and thoughtful independent review of counsel's arguments and the prior competency evaluation report to conclude that a second competency evaluation was not warranted in this case.

For the foregoing reasons, we conclude that the defendant has not met his burden of showing that, at the time he moved for a competency examination, the court had before it specific factual allegations that, if true, would have constituted substantial evidence of mental impairment. The record before us does not support the conclusion that the court abused its discretion by denying the defendant's second motion for a competency evaluation.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 54-56d (c) provides: "If, at any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency."

[2] The public defender's office previously had represented the victim in the case on two unrelated matters, and thus Eddy argued that because of his knowledge of confidential information about the victim, a special public defender should be appointed to represent the defendant so as to avoid a conflict of interest. We note that in accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] The defendant had been transported from the correctional facility to the courthouse on June 30, 2011, but refused to present himself in the courtroom. The court also noted that the case flow coordinator, Lori Warshol, reported that she had spoken to prison officials on June 28, 2011, following his complaints of chest pain, and "they indicated to her that [the defendant] did not complain of any physical ailment when he arrived back at the prison, and that he did not need any medical treatment when he arrived back at the prison from the courthouse."

[4] We note that the state decided not to go forward with trial on the Part B information.

[5] The presentation of evidence took place over three days, during which time the state called six witnesses, including the victim, and introduced two exhibits. The defense also called six witnesses, including the defendant, and introduced two exhibits.

[6] The court noted that the defendant wore a suit and tie at trial.

[7] Our Supreme Court has clarified that an "independent inquiry" by the court into the defendant's competency is distinguishable from the "independent competency examination of the defendant as provided by § 54-56d (d),

. . . [T]he independent inquiry required by due process whenever an allegation of incompetence has been made is a hearing before the court, not an independent psychiatric evaluation as provided by statute." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 271–72, 849 A.2d 648 (2004). An independent psychiatric evaluation is ordered only when "a reasonable doubt is raised regarding the defendant's competency," when the defendant "present[s] substantial evidence, not merely allegations, that he is incompetent." (Internal quotation marks omitted.) Id., 272.

[8] During his colloquy with the court, although defense counsel noted that he had observed disruptive behavior by the defendant outside of court, he clarified as follows that his request for a second competency evaluation was based on the same pattern of disruptive behavior that the court had previously observed:

"The Court: Okay. But am I correct that it's—it's not that he said anything particular to you outside of court that causes you to question his mental competency?

"[Defense Counsel]: No, it's not.

"The Court: Okay. So, it's based upon his refusal to cooperate and his behavior in court?

"[Defense Counsel]: And his behavior in court and the way he behaved when I visited—tried to visit him.

"The Court: Yeah, I just want to make sure because I've obviously observed his behavior in court; I just want to make sure that you don't know something I don't know in order for me to rule appropriately on this request.

"[Defense Counsel]: Well, hopefully, I'm not in violation of any Practice Book rules, but you know everything. I made you privy earlier today to what I know, Your Honor.

"The Court: Okay."

[9] Our Supreme Court has granted certification in *Dort*, inter alia, on the question of whether we properly held that the trial court conducted an inadequate independent inquiry into the defendant's competency when it did not canvass the defendant personally as part of that inquiry. "By operation of Practice Book § 84-3, [when an appeal is on certification to our Supreme Court], a stay on the judgment of this court remain[s] in effect until our Supreme Court render[s] its final determination of the cause . . . ." *State* v. *Oral H.*, 125 Conn. App. 276, 280, 7 A.3d 444 (2010), cert. denied, 300 Conn. 902, 12 A.3d 573, cert. denied,    U.S.    , 131 S. Ct. 3003, 180 L. Ed. 2d 831 (2011). Thus, *Dort* lends little precedential support to the defendant's argument.

[10] Specifically, the court noted that "I've obviously observed his behavior in court," and that "this behavior is intentional behavior on his part to disrupt the proceedings, and that's been crystal clear to me from . . . his behavior." In finding that "every day he comes in here in a further effort to disrupt these proceedings, [and that] he just tries something new and different every day in the hopes to get this off track," the court concluded that "based upon the behavior I've seen, I don't find it to be evidence . . . of incompetence."

[11] Although in *Dort*, we concluded that the trial court had failed to conduct an adequate independent inquiry into the defendant's competency, in part because it did not canvass or speak directly with the defendant, it cannot be inferred from that holding that a trial court is *required* to canvass the defendant personally as part of its independent inquiry into his competency to stand trial. The specific factual background of *Dort* and the court's independent inquiry are distinguishable from those in the present case. Here, Judge Alander had observed the defendant's disruptive behavior and had spoken directly with him at length on four occasions prior to defense counsel's request for a competency evaluation. Also unlike in *Dort*, defense counsel here never asked the court to canvass the defendant personally or to allow him to make a statement on his own behalf to the court. Moreover, the trial court in *Dort* failed to make a record of its observations of the defendant's behavior and denied counsel's request for a competency evaluation without further comment. Here, quite to the contrary, the court made an extensive record of its observations of the defendant's behavior, and denied counsel's request for a competency evaluation only after engaging in a detailed colloquy with counsel for both parties, reviewing the previous competency report, and making its own findings about the defendant's competency.

---