******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE GLERISBETH C. ET AL.*
(AC 37846)

Sheldon, Prescott and Flynn, Js.

*Argued September 9—officially released December 22, 2015***

(Appeal from Superior Court, judicial district of

Middlesex, Child Protection Session at Middletown, C. Taylor, J.)

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent mother).

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Deetta C. Roncone*, for the minor children.

*Opinion*

SHELDON, J. In this appeal from the trial court's judgment terminating her parental rights to her two youngest children, Glerisbeth and Jesus, the respondent mother[1] claims that the trial court violated her due process rights under the United States constitution by failing, sua sponte, to conduct a hearing as to her competency to stand trial.[2] We affirm the judgments of the trial court.

The trial court set forth the following relevant facts and procedural history in its memorandum of decision. The Department of Children and Families (department) first became involved with the respondent's family in October, 2004, when it was notified by Hartford Hospital that the respondent and her newborn son, Jesus, had both tested positive for cocaine. The matter was referred to the department's ongoing services unit.

On August 30, 2010, the department received another referral about the respondent's family from the Connecticut Children's Medical Center, which reported that Jesus had disclosed to the respondent that his father had sexually abused him. Upon substantiating the allegation of sexual abuse, the department referred this matter to its ongoing services unit as well and implemented a safety plan to ensure that the father would have no further contact with either Jesus or Glerisbeth.

In November, 2010, the department was informed by one of the respondent's adult daughters that the respondent was allowing the minor children's father to have contact with them. On the basis of that report, the petitioner, the Commissioner of Children and Families (commissioner), took custody of the children pursuant to a ninety-six hour hold.[3] Thereafter, the commissioner filed parallel neglect petitions with respect to the two children. The proceedings so initiated resulted in the issuance of an order of six months' protective supervision with respect to both children.

On October 18, 2012, the department received another referral regarding the respondent's family from the Village for Children and Families, which reported that there had been a physical altercation between the respondent and her pregnant adult daughter[4] in the presence of Jesus, who had attempted to break it up. On the basis of that report, the commissioner once again took custody of Jesus and Glerisbeth pursuant to a ninety-six hour hold.

On October 23, 2012, the commissioner filed separate neglect petitions as to the two children, alleging that they had been denied proper care, treatment and attention, physically, educationally or morally, or that they were being permitted to live under conditions injurious to their well-being. That same day, the commissioner sought and obtained an order of temporary custody (OTC) with respect to the two children. Pursuant to

the OTC, the trial court issued preliminary specific steps for both parents and found that the department had made reasonable efforts to avoid the need to remove the children from their home.

On November 2, 2012, the respondent and the children's father appeared before the trial court, which advised them of their rights, confirmed that proper service of process had been made upon them, and appointed counsel to represent them. Both parents agreed that the OTC should be sustained, but entered pro forma denials to the neglect petitions as to Jesus and Glerisbeth. After issuing specific steps for both parents, the court continued both neglect matters for further proceedings.

On November 29, 2012, the commissioner filed a motion for psychological examination of both parents pursuant to General Statutes §§ 45a-717 (d), 46b-129a (1) and 46b-121 (b). The motion was based upon the following allegations: "[t]he history of sexual abuse, the exposure of the children to violence, the previous involvement of the court, the mental health issues of the respondent mother, the bizarre behaviors of the respondent mother and the lack of progress in addressing those issues, despite the provision of services, raises questions about the competency or ability of the respondent parents to care for the[ir] . . . children." The court granted the motion for psychological examination by agreement of the parties.

On October 29, 2013, approximately one year after the commissioner filed neglect petitions as to Jesus and Glerisbeth, separate petitions were filed to terminate the parental rights of the respondent and the children's father on the ground of failure to rehabilitate. The commissioner based the claim of failure to rehabilitate as to the respondent on what was alleged to be her "significant mental health issues, substance abuse issues and history of domestic violence." On November 26, 2013, the trial court confirmed service of the termination petitions upon the respondent and advised her of her rights in connection with the termination proceedings. Eleven months later, on November 19, 20, and 21, 2014, the termination trial was conducted before Judge Carl Taylor in the Superior Court at Middletown. By memorandum of decision filed March 5, 2015, the court granted both termination petitions. It thereby terminated the parental rights of both parents as to the two minor children and appointed the commissioner to serve as their statutory parent for the purpose of securing an adoptive family or other permanent placement for them. This appeal followed.

The respondent claims on appeal that the trial court violated her due process rights under the United States constitution by failing, sua sponte, to conduct a hearing as to her competency to stand trial on the termination petitions. Conceding that she did not preserve this claim

before the trial court, the respondent seeks review of the claim and reversal of the judgments terminating her parental rights as to Jesus and Glerisbeth under *State v. Golding*, 213 Conn. 233, 239–240, 567 A.2d 823 (1989). The respondent can prevail under *Golding* only if "*all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) Id., 239–40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*).

Here, the respondent plainly satisfies the first and second prongs of *Golding* as to her claim that the trial court erred by failing, sua sponte, to conduct a hearing as to her competency to stand trial on the termination petitions. She satisfies the first prong of *Golding* because the record before us is adequate to review her claim. She satisfies the second prong of *Golding*, moreover, because, as our Supreme Court held in *In re Alexander V.*, 223 Conn. 557, 560, 613 A.2d 780 (1992), her claim is based upon the alleged violation of her fundamental constitutional right not to be deprived of her liberty—specifically, her basic constitutional right to raise and remain together with her children free from interference by the state—without due process of law. We must therefore go on to determine if the respondent can also satisfy the third and fourth prongs of *Golding* by showing that the alleged constitutional violation both occurred and deprived her of a fair trial, and, if so, that the state cannot prove that that violation was harmless beyond a reasonable doubt.

In *Alexander V.*, our Supreme Court did not hold that due process invariably requires a hearing as to the competency of a respondent parent in a termination proceeding to stand trial. Nor did it hold that a termination trial, like a criminal trial, can never lawfully be conducted when a respondent parent is incompetent to stand trial. The court declined to impose such absolute requirements in the termination context because there, unlike in the criminal context, the legitimate interest of the party whose competency is at issue must be balanced against the vital interests of other parties, particularly the children whose welfare is the central focus of the proceeding. See id., 564–65. Children involved in termination proceedings have a strong interest in the speedy resolution of such proceedings, for regardless of their outcome, their final resolution promotes permanency in the children's family relationships and stability in their lives. Id., 565. The promotion of those objectives may be put at risk, if not fatally com-

promised, by injecting undue delay for any purpose into a termination proceeding. Id.

One obvious consequence of requiring a hearing as to the competency of a respondent parent to stand trial in a termination proceeding would be delaying the final resolution of that proceeding until the competency hearing was concluded. Further delay would inevitably arise, moreover, from any further requirement that a parent found incompetent to stand trial on a termination petition be restored to competency before further proceedings in the case can be held. See Practice Book § 32a-9 (b) ("[i]f competency may be restored within a reasonable period of time, the judicial authority shall stay proceedings and shall issue specific steps the parent shall take to have competency restored"). With these considerations in mind, our Supreme Court decided in *Alexander V.* that, to strike a proper balance between the legitimate interests of respondent parents not to have their parental rights terminated while they are incompetent to stand trial and the legitimate interests of their children to have termination proceedings brought to an expeditious conclusion, due process requires that competency hearings be conducted as to respondent parents in termination proceedings in two specific situations: "when (1) the parent's attorney requests such a hearing, or (2) in the absence of such a request, the conduct of the parent reasonably suggests to the court, in the exercise of its discretion, the desirability of ordering such a hearing sua sponte. In either case, the standard for the court to employ is whether the record before the court contains specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Evidence is substantial if it raises a reasonable doubt about the [parent's] competency . . . ." (Citations omitted; internal quotation marks omitted.) *In re Alexander V.*, supra, 223 Conn. 566.[5]

To perform its constitutional duty of protecting the due process rights of respondent parents in termination proceedings, as prescribed in *Alexander V.*, the trial court must be attuned to the potential of any evidence in the case before it to raise doubt as to the parents' competency to stand trial. "Evidence," for this purpose, includes "all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court." (Internal quotation marks omitted.) *In re Kaleb H.*, 306 Conn. 22, 31, 48 A.3d 631 (2012).

Whether evidence of record raises a reasonable doubt as to a parent's competency to stand trial depends, in the first instance, upon its generic potential, if credited, to raise doubt about the parent's mental competency. "By definition, a mentally incompetent person is one who is unable to understand the nature of the termina-

tion proceeding and unable to assist in the presentation of his or her case." *In re Alexander V.*, supra, 223 Conn. 563. If, then, any evidence of record is found to have the potential to raise doubt as to a respondent parent's ability to understand the proceedings against her and to assist her counsel in the presentation of her case, the court must determine, in the exercise of its sound discretion, whether such evidence actually raises a reasonable doubt about the parent's present competency to stand trial in the context of the entire case. See id., 566. This second, discretionary step is essential because the true focus of a competency inquiry is not the long-term mental health history of the respondent parent, but her "present ability to consult with h[er] lawyer with a reasonable degree of rational understanding— and whether [s]he has a rational as well as factual understanding of the proceedings against h[er]." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Mordasky*, 84 Conn. App. 436, 446, 853 A.2d 626 (2004); see also *In re Kaleb H.*, supra, 306 Conn. 22.

Because the true focus of the competency inquiry is the parent's present ability to assist her counsel with a rational and factual understanding of the proceedings against her at the time of trial, "[t]he trial judge is in a particularly advantageous position to observe a [respondent's] conduct . . . and has a unique opportunity to assess a [respondent's] competency. A trial court's opinion, therefore, of the competency of a [respondent] is highly significant." (Internal quotation marks omitted.) *In re Zowie N.*, 135 Conn. App. 470, 495, 41 A.3d 1056, cert. denied, 305 Conn. 916, 46 A.3d 170 (2012) "[W]e [thus] give deference to the trial court's [competency determination] because the trial court has the benefit of firsthand review of the [respondent's] demeanor and responses during the [proceeding]." *State* v. *Johnson*, 253 Conn. 1, 27 n.26, 751 A.2d 298 (2000).

"In determining whether a trial court has abused its discretion, an appellate court must make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Accordingly, review of [discretionary] rulings is limited to questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Citation omitted; internal quotation marks omitted.) *In re Kaleb H.*, supra, 306 Conn. 32. "In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action." (Internal quotation marks omitted.) *State* v. *Hernandez*, 254 Conn. 659, 665, 759 A.2d 79 (2000). This standard of review applies no less to a discretionary determination not to act sua sponte when to do so is required by law in particular circumstances than to a discretionary ruling expressly granting or denying a request by counsel that the court so act.

Presuming, as we must in the absence of clear evidence to the contrary, that the court was well aware of its legal duty to conduct a hearing to determine the respondent's competency to stand trial if the evidence before it raised a reasonable doubt as to her present ability to understand the proceedings against her and to assist counsel in the presentation of her case; see *Havis-Carbone* v. *Carbone*, 155 Conn. App. 848, 867, 112 A.3d 779 (2015); we treat its failure to order such a hearing as the result of its discretionary determination that no such action was called for in the circumstances before it. See, e.g., *State* v. *Paulino*, 127 Conn. App. 51, 70, 12 A.3d 628 (2011).

The respondent's mental health was a focal point of these proceedings on the commissioner's petitions to terminate her parental rights to her two minor children. In its thorough, seventy-eight page memorandum of decision, the trial court discussed the respondent's mental health issues at length. The court noted that the respondent had a "significant mental health history," which began when she was a child. She had been diagnosed with bipolar and schizoaffective disorders, which had sometimes manifested themselves in severe symptoms, including command hallucinations to harm herself or others, and had sometimes required her hospitalization. The common effect of the respondent's mental health problems upon her, as described by the trial court, was to render her incapable of focusing on the interests of others, including her children, and thus of understanding the impact of those problems upon them. At no time, however, did the trial court find that the effects of such problems upon on the respondent's ability to function as a competent parent had any correspondingly adverse impact on her competency to stand trial.

In support of the respondent's claim that the record before the trial court contained specific factual allegations that, if true, should have caused the trial court to entertain a reasonable doubt about her competency to stand trial, and thus to conduct a competency hearing, the respondent relies upon evidence of two sorts. First, she relies upon reports and testimony from certain of the respondent's caregivers and evaluators as to the effects of her mental health problems upon her day-to-day functioning. On the basis of their observations—including that, despite her twice daily receipt of medication for her disorders, she still experienced command hallucinations and had difficulty distinguishing fantasy from reality—she argues that the evidence before the court necessarily raised a reasonable doubt as to whether she had a rational understanding of the proceedings against her, which is one essential component of competency to stand trial. Secondly, she relies upon portions of her own trial testimony, which she claims to demonstrate she lacked a factual understanding of the proceedings against her, a second essential compo-

nent of competency to stand trial. We are not persuaded by either of these claims.

In support of her first claim, the respondent relies initially upon the report and trial testimony of Dr. Ines Schroeder, which was based principally upon her psychological evaluation of the respondent in March, 2013. According to Schroeder's report, the respondent "presented as a person who struggles to understand her environment well. She has difficulty assessing information accurately and developing sound interpretations. She has reported hallucination[s] and a struggle to recognize fantasy from fiction." In her testimony, moreover, Schroeder stated that the respondent "has great difficulty understanding the impact of things around her" and has difficulty "understanding reality versus fantasy."

Taken out of context, these excerpts from Schroeder's report and testimony might be read to suggest reason for doubting the respondent's mental competency, at least when she is having hallucinations or experiencing difficulty in distinguishing fantasy from reality. The trial court had before it, however, the entirety of Schroeder's report and testimony, as well as the records and testimony of other medical professionals who monitored and evaluated the respondent, in addition to its own extended opportunity to observe the respondent's conduct in the courtroom and to hear her testimony at trial. When considered in this broader context, the respondent's claim fails.

To begin with, Schroeder's report and testimony contained no expression of opinion that the respondent was experiencing the most severe symptoms sometimes associated with her mental disorders either at the time of her evaluation or, more importantly, at the time of trial. As for the respondent's reported struggle with schizoaffective disorder and her "inability to distinguish between reality and fantasy," Schroeder explained, "That is episodic and during times of significant difficulties for her. There are times that she will perceive things in the environment that are not real or not true and assume that they are true and have difficulty believing anyone telling her different." When she had such problems in the past, moreover, their effects were immediate and obvious, sometimes resulting in her hospitalization. In fact, the record revealed that the respondent had not had any hallucinations since July, 2013, more than one year before the start of trial.[6]

The more common effect of the respondent's mental problems upon her, moreover, was not to cause her to lose all touch with reality, but rather to cause her to react to her problems in such a way as to minimize her immediate stress, and, as Schroeder noted in her report, sometimes without "understand[ing] the impact of her actions on others or the situation. She absorbs very few cues from the environment before making a deter-

mination about her setting. Then, she will react with this information with little thought or consideration regarding the consequences of her actions." She thus "attempts to reduce her difficulties by having very few demands on her time or expectations outside of the home. . . . Instead, she works diligently to address problems quickly to avoid the stress that may come from waiting. She will employ whichever strategy she has thought of first with little contemplation to its effectiveness for the situation or the ramifications of her actions."

At trial, Schroeder thus testified that when she interviewed the respondent in March, 2013, the respondent was oriented to the time, place and purpose of their interaction. Schroeder reported, more particularly, that the respondent "was able to tell me how she arrived [at the interview]. She was able to tell me, as we talked about in the beginning, [about] the release and all the issues with regards to the court. She indicated that she understood that this [interview] was for court and the evaluation materials would be sent to the court." Schroeder's report and testimony, when examined in their entirety, thus bely the respondent's conclusion, which she draws from excerpts of Schroeder's report and testimony, that: "It is certainly difficult to understand how the respondent could assist her counsel in preparation for trial, or aid in her own defense, when she has oral and visual hallucinations, struggles to understand her environment, experiences difficulty with assessing information accurately and developing sound interpretations, experiences great difficulty understanding the impact of things around her, struggles to relay historical information coherently, and cannot distinguish between fact and fiction." (Internal quotation marks omitted.)

The respondent also argues that her "schizoaffective disorder has not been alleviated by any of the medication or services she has received." In support of this argument, the respondent cites to a social study prepared by Lorin Pasternak, a department social worker, which was completed on October 29, 2013. In that social study, Pasternak noted, inter alia, that "[the respondent's] mental health continues to be unstable and erratic at times despite being engaged in therapy twice weekly and receiving twice daily psychotropic medication." At trial, Pasternak testified that "even on medication, [the respondent] was still having command hallucinations, and it was concerning to the department that twice a day she had to be assessed for her—to see whether mentally she was stable." Pasternak also reiterated at trial her earlier statement from the October, 2013 social study, elaborating, "But even on medication, she still had to be assessed twice a day for her mental health. She still had command hallucinations. And that's what the concern was. That, even on medications, her mental health wasn't really under control."

Although the respondent has quoted accurately from Pasternak's report and testimony, which were based upon the respondent's self-reports as to prior hallucinations and the records before her as to the respondent's ongoing treatment one full year before trial, the testimony at trial clearly indicated that the respondent had not suffered a hallucination since July, 2013. Although the respondent had previously suffered from hallucinations, and had at times experienced difficulty in distinguishing fantasy from reality, the testimony at trial revealed that those particular symptoms had abated by the time of trial. The respondent's visiting nurse, Agata Pawlowski, testified that in the months leading up to trial, she had visited the respondent twice each day to administer medication to her. On each of those visits, Pawlowski had conducted a mental health assessment of the respondent. On the basis of her observations of the respondent during these visits, Pawlowski concluded that by the time of the termination trial, the respondent's mental health had stabilized with the aid of her medications. She thus reported that the only exception she observed in that time frame to the general improvement of the respondent's mental health was some understandable anxiety she was then experiencing due to the pendency of these termination proceedings, the pendency and significance of which with respect to the potential termination of her parental rights she well understood.

Consistent with Pawlowski's daily observations of the respondent, department social worker Francine Hall testified that the last time the respondent had reported having any hallucinations was in July, 2012. Hall reported that changes in the respondent's medication had assisted her in resolving that issue.

In addition to the foregoing reports and testimony, the court file reveals that the respondent was present in court in this matter on several occasions prior to the termination trial. Those occasions included the initial OTC hearing on November 2, 2012; the neglect adjudication and disposition commitment on December 13, 2012; the in-court review on January 10, 2013; a hearing on the commissioner's motion to suspend visitation on June 27, 2013; an in-court review regarding the suspension of visitation on July 16, 2013; a hearing on a motion to review a permanency plan on September 3, 2013; the plea hearing on the termination petitions on November 26, 2013; a hearing on a motion to review permanency plan on July 15, 2014; and a hearing on a motion for a finding of paternity on August 6, 2014. On no such occasion did the trial court, the respondent's counsel, or anyone else involved in this case raise any concern about the respondent's competency to stand trial.[7]

Furthermore, the respondent herself testified at the termination trial. Prior to the commencement of her testimony, the court canvassed her about her decision

to testify. The court asked the respondent if she understood that she had a right not to testify, if she understood that she could not be forced to testify and if her decision to testify was free and voluntary. The court also asked whether the respondent had had the opportunity to discuss her decision to testify with her attorney and whether she was satisfied with his advice and assistance. The respondent answered in the affirmative to all of those inquiries and affirmed as well her understanding that she would be subject to cross-examination by all of the other lawyers in the case.

The respondent's ensuing testimony revealed not only that she had a rational and a factual understanding of the termination proceedings, but that she was an accurate historian as to the events that had given rise to those proceedings.[8] She thus responded to her attorney's questions in a manner that was at all times consistent with her stated desire to retain her parental rights.

Notwithstanding the respondent's responses to the court's canvass, the respondent claims that her ensuing testimony revealed that she was unable to understand the nature of the proceedings against her. On this score, she argues: "[E]ven after the respondent had observed three days of trial testimony, in which the petitioner put on seven witnesses and introduced eighteen full exhibits, she testified that she did not understand any of the reasons why [the commissioner] sought to terminate her parental rights. Nor could she formulate a coherent, rational response to any of the [commissioner's] accusations." The respondent contends, more particularly, that her failure to understand the proceedings against her was clearly demonstrated by the following exchange between her and her counsel on direct examination:

"[The Respondent's Attorney]: Do you understand the reasons that [the commissioner] is providing to justify the termination of your parental rights?

"[The Respondent]: No.

"[The Respondent's Attorney]: Did you hear the testimony at trial, in this trial?

"[The Respondent]: Yes.

"[The Respondent's Attorney]: Do you agree with what [the commissioner] is saying?

"[The Respondent]: No.

"[The Respondent's Attorney]: Why not?

"[The Respondent]: Because [the department], they're abusers."

In making this argument, however, the respondent has omitted her telling response to her attorney's follow-up question asking her to explain her accusation against the department. The respondent cogently explained her answer: "Once I went for a visit [to the

department office] and Chris [Padilla, a department social worker] came to the visit . . . . He sat down, and he said to my son, my son was anxious, he was not sitting still and said 'baby Jesus' with the telephone cable 'do you want to do like this,' insinuating that my son wanted to commit suicide. And he went like that to him, he shook him." The respondent's answer demonstrated not only an understanding of the proceedings against her, but knowledge of the full name of one of the social workers involved in the case and an understanding that, if that social worker engaged in the conduct she described with her child, such conduct was completely inappropriate.

The respondent's attorney then examined the respondent as to the commissioner's claims against her, asking her first if she agreed with the commissioner's position that her mental health difficulties affected her ability to parent her children. She responded to this question in the negative, explaining: "I'm a good mother and I know how to raise children. . . . I take them to the park. I cook what they want. I buy them everything they want. I give them a lot of love." She then restated that she could take care of her children and pleaded that they be returned to her.

In sum, the record before the trial court undermines the respondent's claim that she did not understand the proceedings against her or that she was unable to assist her lawyer in the defense of her case. In her testimony, the respondent offered explanations for and disputed the validity of several of the allegations made against her by the commissioner in support of the termination petitions.[9] There was nothing in the respondent's testimony or her other behavior in court that should have prompted the court, sua sponte, to order an investigation or conduct a hearing as to her competency to stand trial. The respondent answered all of the questions put to her appropriately, and in a manner consistent with her position at trial. The record is replete with notations by various individuals involved in the care and treatment of the respondent that she had expressed depression and anxiety as to the commissioner's efforts to take custody of her children and put them up for adoption. The few instances documented in her appellate brief, in which she testified that she did not understand the commissioner's actions against her, evidenced not a lack of understanding of the nature of the termination proceedings, but a fundamental disagreement with the commissioner as to her ability to be an effective parent for her children.

On the basis of the foregoing, we conclude that the court's failure, sua sponte, to order a competency evaluation of the respondent did not constitute an abuse of its discretion or a violation of the respondent's due process rights under the United States constitution. Accordingly, the respondent's claim fails under the third

prong of *Golding*.

The judgments are affirmed.

In this opinion the other judges concurred.

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of this court.

\*\* December 22, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The parental rights of the father of the minor children were also terminated, but he has not challenged that judgment. In this opinion we refer to the respondent mother as the respondent.

[2] The attorney for the minor children has filed a position statement in connection with this appeal, adopting as her own the brief of the petitioner.

[3] General Statutes § 17a-101g provides in relevant part: "(e) If the Commissioner of Children and Families, or the commissioner's designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from the child's surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or the commissioner's designee, shall authorize any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian. The commissioner shall record in writing the reasons for such removal and include such record with the report of the investigation conducted under subsection (b) of this section.

"(f) The removal of a child pursuant to subsection (e) of this section shall not exceed ninety-six hours. During the period of such removal, the commissioner, or the commissioner's designee, shall provide the child with all necessary care, including medical care, which may include an examination by a physician or mental health professional with or without the consent of the child's parents, guardian or other person responsible for the child's care, provided reasonable attempts have been made to obtain consent of the child's parents or guardian or other person responsible for the care of such child. During the course of a medical examination, a physician may perform diagnostic tests and procedures necessary for the detection of child abuse or neglect. If the child is not returned home within such ninety-six-hour period, with or without protective services, the department shall proceed in accordance with section 46b-129. . . ."

[4] In addition to the two children who are at issue in this case, the respondent has five adult children.

[5] Our Supreme Court's holding in *Alexander V.* has been incorporated into the rules of practice. See Practice Book § 32a-9 (a) ("[i]n any proceeding for the termination of parental rights, either upon its own motion or a motion of any party alleging specific factual allegations of mental impairment that raise a reasonable doubt about the parent's competency, the judicial authority shall appoint an evaluator who is an expert in mental illness to assess such parent's competency; the judicial authority shall thereafter conduct a competency hearing within ten days of receipt of the evaluator's report").

[6] The respondent claims in her reply brief to this court that the commissioner should be judicially estopped from arguing that she had not experienced any hallucinations for over one year before the start of trial based upon counsel's argument to the trial court that she was still experiencing such hallucinations at the time of trial. Because the respondent has raised this claim for the first time in her reply brief, we are disinclined to address it. See *State* v. *Houghtaling*, 155 Conn. App. 794, 797 n.2, 111 A.3d 931 (2015). We note, however, that even if counsel's argument could have been so understood, the argument itself was not evidence in the case—a fact that the trial court doubtlessly understood—and was completely unsupported by the evidence. See *In re Shanaira C.*, 297 Conn. 737, 761, 1 A.3d 5 (2010).

[7] We note that, in addition to presiding over the three day termination trial, Judge Taylor also presided over one of the pretrial hearings. Judge Dannehy presided over six of the pretrial hearings and Judge Burgdorff presided over two of them. Like Judge Taylor, neither Judge Dannehy nor Judge Burgdorff raised the issue of the respondent's competency to stand trial.

[8] Following the court's canvass, the respondent's attorney began his direct examination. To begin, he asked the respondent: "Do you understand why

you're here today? . . . . [C]an you explain what this proceeding is about?" The respondent answered, "It's about the custody of my babies." When asked, "[d]o you understand who the gentleman is to your right," the respondent correctly stated, "This gentleman is the judge." The respondent's attorney then guided the respondent through her acknowledged history of mental illness. The respondent explained that her mental health issues began when she was nine years old and she witnessed her father slaughter a goat, which she had considered a pet. She accurately stated that she has been diagnosed as schizophrenic and bipolar and that she has suffered from hallucinations. She explained that she has been on several medications throughout her life and that they are always being changed due to various side effects. Her attorney asked her about the medications she is "taking now" and she explained that she is taking seven different medications and feels "really good." The respondent discussed her relationship with the respondent father and their care of the children.

[9] When asked about the respondent's prior allegation that the father had sexually abused their son, she explained that she had been hallucinating at that time and that it did not, in fact, occur. The respondent testified regarding the October, 2012 incident with her adult daughter that resulted in the neglect petitions underlying this termination proceeding. She testified that her daughter is a drug addict who demanded money from her and, when the respondent refused to give it to her, both her daughter and her daughter's husband hit her. After the police were called in response to that altercation, the respondent explained that "[the department] got there and they took my, they took my children away. . . . And [the department] took my children away without asking questions or anything." The respondent also explained that she had brought a knife with her to one of her supervised visits with the children so she could cut her daughter's birthday cake.

On cross-examination by the commissioner, the respondent testified that she knew that the department did not want her older daughter living with her due to her daughter's drug use, but defended her willingness to allow her to stay by explaining that her daughter wasn't using drugs at the time because she was pregnant.

————————————————————